STATE of Maine

v.

**John SHORTSLEEVES.**

Supreme Judicial Court of Maine.

Argued June 1, 1990.
Decided Aug. 30, 1990.

Leanne Robbin (orally), Assistant Atty. Gen., Augusta, for plaintiff.

David P. Silk (orally), Curtis, Thaxter, Stevens, Broder & Micoleau, Portland, for defendant.

Before ROBERTS, WATHEN, GLASSMAN, CLIFFORD and COLLINS, JJ.

ROBERTS, Justice.

John Shortsleeves appeals from the judgment entered and the sentence imposed upon his conviction of murder, 17–A M.R.S.A. § 201(1)(A) (1983), in the Superior Court (York County, *Brodrick, J.*). He contends that the court committed reversible error in admitting a medical examiner's testimony that the large number of weapons used was consistent with two assail-

ants. He also challenges his life sentence. We affirm both the conviction and the sentence.

## I. Facts

Shortsleeves gave a statement, recorded on video and audio tape, to the state police about his involvement in the killing of Priscilla Dickerman at her home in Cornish on January 23, 1989. These tapes were played to the jury and transcripts of them were introduced in evidence. Shortsleeves did not testify at trial. He said in the interview that he and Tracy Meggison, who was later convicted of murder, each drank about twelve cans of beer at Shortsleeve's house on the afternoon of January 23. At about 5:00 p.m. they went to Long Pond Road where Dickerman lived. As they drove past her house Meggison said, "That bitch, I want to kill her." They drove on, looked at some camps that had been broken into, and then Meggison said that he wanted to return to Dickerman's house and that he knew her.

Shortsleeves said that he and Meggison drove back to Dickerman's house and parked down the road from it. When a detective asked Shortsleeves what the plan was, he replied, "He wanted to kill her. That's what he was saying and I just followed him." According to Shortsleeves, they left the car and Meggison took a black club with him. Meggison told Shortsleeves that he was going to knock on the door. He gave Shortsleeves the club and knocked on the door while Shortsleeves held the screen door open. Meggison went inside and closed the door while Shortsleeves dropped the club and continued holding the screen door. Meggison asked Shortsleeves to come inside and said to Dickerman, "He's hurt pretty bad." Shortsleeves limped in and said his leg hurt. Dickerman asked Shortsleeves if he was all right and offered to call someone.

Shortsleeves said he did not see Meggison hit Dickerman, but heard something, looked over and saw that she had fallen to the floor. He saw Meggison hit her a few more times with his fist as he yelled, "You bitch, bitch." Shortsleeves went outside, got the billy club, and brought it inside and

handed it to Meggison. Meggison used it to hit Dickerman, who was on her knees. The club eventually broke. Shortsleeves shut the door and shut out the lights. He said that at that point he was feeling "nervous" and "shaky" and "freaking out." Dickerman fell to the floor, Meggison kicked her a few times and told Shortsleeves that he wanted him to kill her. Shortsleeves told him he could not kill her, but he kicked her a few times. Meggison told Shortsleeves to hand him a frying pan, which he did. Meggison hit Dickerman over the head several times with the frying pan. He told Shortsleeves to look for money, which he did. Shortsleeves told Meggison to pick up the broken club and a piece of paper on which Dickerman had written Meggison's name.

Shortsleeves said the two then headed for the door and one or both of them said to the other that they had better make sure she was dead. Meggison got a steak knife, which Shortsleeves helped him find, and sliced her throat as Shortsleeves was standing outside the door. Meggison also stabbed her in the head with a knife, which broke the knife. When the detective asked Shortsleeves why he did not stop Meggison, he replied "I don't know, I really don't."

Meggison took her pocketbook and Shortsleeves took a watch and two knives. They left one light on, shut the door and left the house. Shortsleeves noticed car keys hanging off the pocketbook and told Meggison to take her car and get rid of it. Meggison asked Shortsleeves if he wanted to. Shortsleeves alone drove Dickerman's car away, tossed a knife and the club out of the car in the woods and left the car in a field. The two drove back to Meggison's apartment, where he lived with Stacy Edgerly and Kim Cox. Shortsleeves told the detective he said to Meggison, "That was crazy," and Meggison responded "Yeah, that's the last time we do that."

On January 24, 1989 a neighbor found Dickerman's car in a field and saw blood on a stick in the car. A state trooper found a red splotch on the driver's door. He went to Dickerman's home at 8:20 p.m. and

found a light on inside and a door slightly ajar. He found hair curlers on the floor, a television on the floor lying on its side, and found Dickerman's body on the floor with an overturned drawer beside it. A detective with the Maine State Police testified that he found blood spatters, hair curlers, a steak knife, a shelf and numerous other items strewn around the floor. He found blood on the cooking range and found a broken frying pan, as well as a bloody carving knife and vegetable chopper. He also found a sleeping bag with bloody impressions of footwear on it, one impression of which was later found to have characteristics of Shortsleeve's boots. In the upstairs loft area a small portable television had blood spatters on it.

Another state police detective testified that he searched the woods in the area where Shortsleeves had said he tossed the weapons out of the car and found a knife and a cutting board. The cutting board had blood and hair on it, and the knife was covered with blood. A forensic chemist with the Maine State Police Crime Lab testified that there was blood on Dickerman's car. Type B blood, which was Dickerman's blood type, and hairs that were microscopically similar to Dickerman's were found on the club. Shortsleeves' jeans had type B blood stains on the front of both legs up to the crotch, but did not have extensive stains on the back.

Ronald Roy, a physician, forensic pathologist and Deputy Chief Medical Examiner for the State of Maine, observed Dickerman's body in her home on the evening of January 24, 1989 and later performed an autopsy on her. He testified that blood spatters on Dickerman's feet indicated she was upright for part of the time she was bleeding. She suffered blunt trauma, bruising and lacerations. Her face was severely bruised and she had multiple lacerations on her face and head caused by a blunt instrument. Her nose, jaw and the bone above an eye were fractured. He could not determine the order in which these injuries were inflicted. He testified that the head injuries were inflicted while she was alive and could alone have been fatal.

There were at least nine stab wounds in the neck caused by a sharp instrument, and probably done when she was lying down. These cuts went down to the spinal column and cut the carotid artery, partially decapitating her. There were surface cuts on her chest and a deep cut on her shoulder. Some of the lacerations on her chest suggested she was struggling. One of her ribs was fractured and bruised by a blunt instrument. The backs of her hands showed extensive bruising and a forearm was fractured, wounds Roy described as defense wounds.

Roy testified that a cast iron frying pan found near her body, as well as other objects shown him, such as a knife, a cutting board and a club, could have been used to inflict some of the injuries. The State then asked Roy:

Q: Would there be any way, Dr. Roy, to determine from the nature of the injuries, the number of items I've just shown you, position of Mrs. Dickerman's body as you found it, her likely position as you've already described it at the time injuries were inflicted on her, how many people would have been involved in infliction of the injuries?

A: From examination—

[DEFENSE COUNSEL]: Objection, I would like to have him establish any foundation he has for responding to that question first.

THE COURT: He's a forensic pathologist. The objection is overruled.

THE WITNESS: From examination of the wounds alone, it would not be possible to say. Probably not from the position of the body as well. You've shown me quite a few weapons, however, and that is distinctly unusual. By and large over the 10 years, the homicides I've seen with dealing with—

[DEFENSE COUNSEL]: Objection, again, I believe that goes beyond the scope of his expertise.

THE COURT: That's overruled again. Go ahead.

THE WITNESS: Generally you're dealing with one or two, at most, two or

three, that's quite unusual, weapons. That we have so many weapons, to me would be consistent with two assailants, and not one, distinctly, very unusual.

After the jury retired it returned to receive reinstruction on murder as a principal, murder as an accomplice and manslaughter and to review the video tape. It returned a second time with a request to review the forensic pathologist's testimony regarding "the order of injuries, possible weapons used, and ... the number of people possible in inflicting the injuries as per his past experience." The jury heard the testimony, retired again and shortly thereafter returned the verdict. The defendant's motion for a new trial, based on the admission of the expert testimony about the number of assailants, was denied. The court sentenced Shortsleeves to life in prison. He appealed the judgment and applied for leave to appeal his sentence. The Sentence Review Panel issued an order granting the defendant leave to appeal the sentence.[1]

## II. Appeal of Conviction

■ An expert may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." M.R.Evid. 702. The expert may only testify on subjects not within the common knowledge of the trier of fact. *State v. Black*, 537 A.2d 1154, 1156 (Me.1988). *See also* Field & Murray, *Maine Evidence* § 702.1 (1987). Shortsleeves argues that the testimony about the number of weapons and assailants was erroneously admitted because it was within the common knowledge of the jury. We agree. No scientific, technical or specialized knowledge was needed to infer from the large number of weapons that there may have been more than one assailant.

■ The error, however, must be disregarded if it does not affect the substantial rights of the defendant. M.R.Crim.P.

52(a). Where a severe punishment is involved, we must "be especially slow to regard an error as harmless." Wright, *Federal Practice and Procedure: Criminal 2d* § 854 (1982). An error is harmless if it is highly probable that it did not affect the judgment. *State v. Huff*, 469 A.2d 1251, 1253–54 (Me.1984). In assessing whether the expert's testimony might have had an effect on the jury, we look to "the character of the proceeding, what is at stake upon its outcome, and the relation of the error asserted to casting the balance for decision on the case as a whole...." *Kotteakos v. United States*, 328 U.S. 750, 762, 66 S.Ct. 1239, 1246, 90 L.Ed. 1557, 1565 (1946). We do not determine whether the jury was correct in its judgment, regardless of the error, but rather whether it is highly probable that the error itself had no substantial influence on the jury.

■ Shortsleeves points to the possibility that the jury, if unconvinced that he personally struck any blows, would return a manslaughter verdict. He contends that the State failed to prove his intent to commit any crimes other than burglary and assault and thus failed to prove accomplice liability pursuant to 17–A M.R.S.A. § 57(3)(A) (1983). Absent an intent to commit murder, he says, the most the jury could find would be a failure on his part to be aware that a homicide would likely occur. In so arguing, the defendant misperceives the State's burden of proof of accomplice liability. We have previously held that the second sentence of subsection 57(3)(A) imposes criminal liability as an accomplice for any secondary crime (here murder) that is an *objectively* foreseeable consequence of the defendant's intentional conduct in facilitating the primary crimes (here burglary and assault). *See State v. Linscott*, 520 A.2d 1067, 1070 (Me.1987). Moreover, it is immaterial whether the overt acts of the defendant contributed directly to the death of the victim. *See State*

1. The Legislature has enacted a new provision for a discretionary appeal of sentences to the Law Court. P.L.1989, c. 218; 15 M.R.S.A. §§ 2151–57 (Supp.1989). The Sentence Review Panel granted the defendant's application for leave to appeal from the sentence pursuant to section 2152. The procedure for sentence appeals is set forth in M.R.Crim.P. 40–40C. *See State v. Hallowell*, 577 A.2d 778 (Me.1990).

*v. Flint H.*, 544 A.2d 739, 742 (Me.1988). Given the defendant's admission of conduct intentionally and substantially contributing to Meggison's violent assault on Dickerman and given that a homicide was plainly an objectively foreseeable consequence of that assault, there was little need for speculation about whether Shortsleeves in fact wielded any of the weapons.

We recognize that the character of the proceeding and the outcome for the defendant could not be more serious. Nevertheless, it is highly probable the testimony did not sway the jury, despite its request to hear the testimony a second time. The expert did not conclude that there were two assailants, but stated only that the number of weapons was consistent with two assailants. The testimony was muted by the manner in which it was phrased. Moreover, the evidence was overwhelming to convict Shortsleeves of murder as an accomplice without the expert testimony. *Cf. State v. Vahlsing*, 557 A.2d 946, 949 (Me. 1988) (written document erroneously admitted harmless in light of whole record).

### III. Appeal of Sentence

The general objectives of sentence review by the Supreme Judicial Court sitting as the Law Court are to correct sentences that are excessive in relation to the nature of the offense, the character of the offender and the protection of the public interest, to correct abuses of sentencing power, to ensure fairness of the sentencing process, to facilitate rehabilitation and to promote a rational and just application of sentencing criteria. 15 M.R.S.A. § 2154 (Supp.1989). We are to consider the propriety of the sentence and the manner in which the sentence was imposed. 15 M.R.S.A. § 2155.

The statutes covering the crime of murder and sentencing have undergone significant changes over the last fifteen years. Before the criminal code became effective in 1976, murder was punishable by life imprisonment. R.S.1954, c. 130 § 1. Someone sentenced to life imprisonment was eligible for parole after serving thirty years, less deduction for good behavior. P.L.1957, c. 387 § 12 (as amended by P.L. 1959, c. 312 § 6; P.L.1963, c. 414 § 7; P.L.

1967, c. 391 §§ 28, 29). Later he or she became eligible for parole after serving fifteen years. P.L.1969, c. 280 (amended by P.L.1971, c. 397 § 8).

Under the 1976 criminal code, criminal homicide was divided into six degrees; first degree homicide, committed with aggravating circumstances, carried a mandatory life sentence. P.L.1975, c. 499 § 1, 17–A M.R. S.A. § 1251. If the prisoner had served twenty-five years of the life sentence, it could be reduced to a term of years. P.L. 1975, c. 499 § 1, 17–A M.R.S.A. § 1254. In 1977, the six degrees of criminal homicide were eliminated and the crimes were recategorized as murder, felony murder, manslaughter and aiding or soliciting suicide. P.L.1977, c. 510 §§ 38–43.

Currently the sentence for murder is from twenty-five years to life, with no possibility for reduction of a life sentence to a term of years. 17–A M.R.S.A. § 1251 (Supp.1989). The statute governing life sentences is now harsher, but the court has wide discretion in choosing the duration of the prison term. Consequently, we believe it is appropriate to provide the sentencing court with broad guidelines for the circumstances in which the harshest penalty, a life sentence, may be imposed.

■ In *State v. Anderson and Sabatino*, Nos. 78–37, 78–40 (Me.App.Div. June 30, 1980), the Appellate Division set forth the circumstances that justify a life sentence:

[T]he imposition of a life sentence has such a serious impact on the offender so different from the impact of a sentence for a term of years that a life sentence is never justified unless the murder is accompanied by aggravating circumstances. Such aggravating circumstances include:

1. Premeditation-in-fact. By this we mean a planned, deliberate killing including a killing for hire. By the use of the words "in-fact," we mean to differentiate the premeditation to which we refer from the legal fiction of premeditation recognized in some states in which the premeditation exists for only an instant of time

before the actual killing. (footnote omitted).

2. Multiple deaths, including situations in which the offender in committing the murder knowingly created a substantial risk of death to several individuals.

3. Murder committed by a person who has previously been convicted of homicide or any other crime involving the use of deadly force against a person. We use the words "deadly force" as defined by our Criminal Code in 17–A M.R.S.A. § 2(8).

4. Murder accompanied by torture, sexual abuse or other extreme cruelty inflicted upon the victim.

5. Murder committed in a penal institution by an inmate of that institution. This would include the murder of another inmate as well as prison personnel.

6. Murder of a law enforcement officer while in the performance of his duties.

7. Murder of a hostage.

It is not our intention to suggest that life imprisonment must always be imposed in cases of the types enumerated above. Such an approach was abandoned by our legislature when it repealed the mandatory sentence of life imprisonment for first-degree murder. Even in these circumstances there may be mitigating factors which in the exercise of a sound judicial discretion may cause a presiding Justice to impose a sentence for a term of years rather than life imprisonment.... It is our intention to suggest that under the present formulation of our Criminal Code life imprisonment is not justified in the absence of one of these enumerated circumstances.

We agree that a life sentence may not be imposed unless there are aggravating circumstances of the type enumerated in *Anderson* and *Sabatino*.

The court considered four factors in sentencing Shortsleeves: the nature of the crime, his criminal background, and his character as revealed by his own statements and a report based on a psychological evaluation. It stated with respect to the nature of the crime: "I think it could be called a form of extreme cruelty."

"[T]he motive here appears to be murder for the thrill of it." The court stated that it appeared Shortsleeves just wanted to observe the murder take place and perhaps participate in it. The court described the murder as premeditated.

Shortsleeves argues that the murder was not premeditated because it was not planned for a long time before it was carried out. At the outset, we note that the court must find that Shortsleeves, if convicted as an accomplice, acted himself with premeditation before the court may impose a life sentence; it is insufficient that the principal so acted. The court did not err in finding that the murder was in fact premeditated because Shortsleeves knew in advance of the murder about Meggison's desire to kill Dickerman and he participated in the preparation for the killing for some time before it was carried out. He took no steps to prevent the murder, and he participated in the ruse to gain entry into Dickerman's home. The sentencing court likewise did not err in finding that the murder was committed with "extreme cruelty" and that the defendant knowingly aided in the infliction of such cruelty.

Although the presence of these aggravating circumstances, premeditation and extreme cruelty, permit the imposition of a life sentence, the court must consider whether mitigating factors require a lesser sentence. Shortsleeves argues that the sentencing justice failed to mitigate his sentence to reflect his circumstances. Shortsleeves had an extensive juvenile record that included a violent robbery, and he admitted that he committed a series of burglaries. The sentencing court found that he showed no remorse. The court considered what it described as a "truly devastating" report of a psychologist who had spent several hours with Shortsleeves. The court noted that the psychologist said the defendant lacked remorse, had a severely antisocial, hostile, unstable and psychopathic character and he was unlikely to respond to rehabilitation efforts. The court found the defendant's youth and above-average intelligence to be mitigating

factors, although their effect was diminished due to his already long criminal record.

On balance, we conclude that the sentencing justice did not err in determining that the circumstances of the defendant did not require any mitigation in the sentence.

The entry is:

Judgment affirmed.

Sentence affirmed.

All concurring.