STATE of Maine

v.

**Michael ST. PIERRE.**

Supreme Judicial Court of Maine.

Argued Oct. 2, 1990.
Decided Dec. 19, 1990.

Rae Ann French (orally), Asst. Atty. Gen., Augusta, for plaintiff.

Thomas A. Tilton (orally), Shiro & Shiro, Waterville, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD and COLLINS, JJ.

ROBERTS, Justice.

Michael St. Pierre appeals from his conviction in the Superior Court, (Kennebec County, *Brody*, C.J.), of murder, 17–A M.R. S.A. § 201(1)(A) (1983), and his sentence of life imprisonment. St. Pierre challenges his conviction on two grounds, 1) that the court's erroneous refusal to suppress his confession hindered his ability to put on a credible defense, and 2) that the court allowed two prosecution experts to present improper opinion testimony. St. Pierre also challenges his life sentence on the ground that the record does not establish the aggravating circumstance of extreme cruelty. We disagree with St. Pierre's challenges of his conviction of murder and affirm that conviction. We agree, however, that the court erred in finding that the killing was aggravated by the extreme cruelty that would justify a life sentence without the possibility of parole. Accordingly, we modify St. Pierre's life sentence.

I.

A few minutes before 7:00 a.m. on October 6, 1988, the Waterville police discovered the body of Carlene Grover floating in the Kennebec River near the "Two Cent" bridge in downtown Waterville. They also discovered a bloody trail leading down to the river and a significant amount of blood on a door leading to the second floor apartments over the Bob In, a Waterville restaurant and night spot that was located across the street from the beginning of the bloody trail. At around 9:00 a.m., the officers encountered Michael St. Pierre leaving the Bob In. St. Pierre agreed to their request that he come to the Waterville Police Station.

At the station, prior to any Miranda warning, St. Pierre admitted that at one point during a sexual encounter Grover hurt him at which point he "lost it" and severely beat her with a broken jackhammer bit, then dragged her to the river and deposited her into the water. The officers then read St. Pierre his Miranda rights for the first time. They asked St. Pierre if he still wanted to talk and emphasized that he did not have to. St. Pierre indicated that he was willing to talk and then gave another confession to the officers in which he gave a detailed account of the previous night's activities. After the confession was finished and one officer had left, St. Pierre told the remaining officer, "I forgot to tell you that I tried to strangle her."

St. Pierre moved to suppress all statements made to police, all physical evidence, all test results and all in court and out of court identifications, because he claimed that: 1) he was not given Miranda warnings until after he had confessed; and 2) he was unable to "knowingly and intelligently" waive his Miranda rights. The court granted the motion in part, suppressing St. Pierre's initial admission. Finding no evidence of involuntariness in the initial interrogation, however, the court refused to suppress St. Pierre's statements given after the Miranda warning and found no "fruit of the poisonous tree" problem with respect to the physical evidence garnered in the subsequent investigation.

At trial the State did not introduce St. Pierre's confession, relying instead on the testimony of numerous witnesses and experts linking St. Pierre to Grover on the night of the homicide. St. Pierre's defense was that he was too intoxicated at the time of the killing to appreciate the nature and quality of his actions. This evidence was necessarily testimonial since no blood samples were taken from him. St. Pierre presented testimony from Patrick Demers, a forensic chemist who testified about the effects of alcohol and other drugs on human decision making capabilities. He estimated that a person of St. Pierre's weight, who had consumed as much alcohol as St. Pierre claimed he had consumed between 2:00 p.m. and 1:00 a.m., would probably have had a blood alcohol content of between .18 and .28 at the time of the killing. According to Demers, such a blood alcohol content would have impaired, or even prevented, a person from making knowing decisions.

In rebuttal, and over a defense objection, the State presented the testimony of two witnesses, Doctors MacLean and Jacobsohn. MacLean, a forensic psychologist, testified that, on the basis of interviews with the defendant and testimony presented at trial, it was his opinion that St. Pierre had the capacity to know what he was doing at the time of the murder. Jacobsohn, a forensic psychiatrist, testified that, based on the same evidence, he felt that St. Pierre's level of intoxication was not high enough to have prevented him from acting knowingly on the night of the murder.

## II.

St. Pierre argues that his statements to the police on October 6, 1988 should have been suppressed as products of an unconstitutional interrogation. He contends that, even though his confession was never presented as evidence at trial, the failure of the court to suppress this evidence forced him to admit the crime in his opening statement and thus unfairly prejudiced his ability to defend himself. Because St. Pierre's confession was not presented at trial, we decline to address his arguments. As we have previously stated, denial of a motion to suppress statements not introduced at trial is not cognizable on appeal since addressing such an issue would involve a mere advisory ruling. *See State v. Chapman*, 496 A.2d 297 (Me.1985). Moreover, we agree with the trial court that in the circumstances of this case the seizure of physical evidence was not a result of the confession.

■ St. Pierre also argues that the court improperly allowed the testimony of Doctors MacLean and Jacobsohn because neither was qualified to assist the trier of fact in understanding the testimony presented by the defense's expert, Patrick Demers. St. Pierre further contends that even if MacLean and Jacobsohn were qualified to give expert testimony, it was for the jury to decide whether St. Pierre's judgment was impaired when he killed Grover, and both MacLean and Jacobsohn thus improperly testified as to his capacity to form intent at the time of the murder. Because we conclude that the court exercised sound discretion, *Higgins v. Higgins*, 370 A.2d 670, 674 (Me.1977), we reject both of these contentions.

Expert testimony is admissible if "the matter is beyond common knowledge so that the untrained layman will not be able to determine it intelligently and [if] a person with specialized knowledge can give a helpful opinion." Field & Murray, *Maine Evidence* 702.1 at 263 (1987). In the in-

stant case the testimony of both MacLean and Jacobsohn was based on knowledge beyond that of an untrained layman. MacLean specializes in forensic psychology and Jacobsohn specializes in forensic psychiatry, subspecialties of their respective fields that perform evaluations, usually for the legal system, concerning the existence or non-existence of legally relevant states of mind. MacLean testified that, although he had no expertise on the effects of alcohol and other drugs in a chemical sense, he considered himself an expert on the behavioral manifestations of such drug use. As a physician, Jacobsohn had knowledge beyond that of the untrained layman on the physiological as well as psychological aspects of alcohol and drug use.

■ St. Pierre argues that the testimony of the expert witnesses usurped the role of the jurors in contravention of the principles we set forth in *State v. Flick*, 425 A.2d 167, 170–71 (Me.1981) and *State v. Ellingwood*, 409 A.2d 641, 645 n. 4 (Me.1979). He misconstrues our statements on "ultimate issue" testimony. The defense in *Flick* sought to elicit from two expert witnesses "their opinions as to whether Flick acted intentionally or knowingly at the time of the killing." *Flick*, 425 A.2d at 170. In the present case, MacLean and Jacobsohn were asked their opinion as to whether St. Pierre *had the capacity* to act intentionally or knowingly based on trial testimony as to his actions on the night of the killing and on his recall of those events. Moreover, that opinion evidence was offered to rebut defense testimony concerning the effects of drug and alcohol intoxication. *See generally, State v. Murphy*, 496 A.2d 623, 630–32 (Me.1985) (error to exclude testimony meeting the requirements for admissibility set forth in *Flick*).

### III.

■ At the sentencing hearing the court was presented with a recommendation of 50 years from the prosecution, twenty-five years from the defense and life from the pre-sentence report. The court discussed the criteria set forth in *State v. Anderson and Sabatino*, Nos. 78–37, 78–40 (Me.App.

Div. June 30, 1980) that we subsequently adopted in *State v. Shortsleeves*, 580 A.2d 145, 149–50 (Me.1990). Both opinions stated that imposition of a life sentence is permissible only if there are aggravating circumstances of the type enumerated therein. *Id.* at 150. In this case the court stated that it found only one aggravating circumstance, extreme cruelty, that would justify the imposition of a life sentence. According to the court the numerous blows with a heavy instrument and the dragging of the body into the river required a finding of extreme cruelty. On this basis, the court imposed a life sentence on St. Pierre.

The extreme cruelty circumstance was adopted in *Shortsleeves* as "murder accompanied by torture, sexual abuse or other extreme cruelty inflicted upon the victim." *Shortsleeves*, 580 A.2d at 150. In that case we stated that even when the presence of aggravating circumstances permit the imposition of a life sentence, the court must consider whether mitigating factors require a lesser sentence. *Id.* Although the court in the instant case explicitly stated that it did not find any extenuating circumstances, it also noted that St. Pierre had no "heinous" criminal record, that his prospects for rehabilitation were fairly good and that he did not pose a significant threat to the public. More importantly, we conclude that the defendant's conduct did not evidence the extremely vicious quality that would constitute extreme cruelty.

Though it is axiomatic that any murder is a cruel and unfeeling act, 17–A M.R.S.A. § 1251 allows for sentences ranging from twenty-five years to life without the possibility of parole. We are therefore commanded to arrange these heinous acts on a continuum in order to determine which act justifies the imposition of the most extreme punishment. Imposition of a life sentence on the basis of extreme cruelty alone will require a showing that the viciousness of the murder differed in a substantial degree from that which inheres in the crime of murder. As the Appellate Division stated in *State v. Haberski*, No. AD–85–54 (Me. App.Div. February 6, 1987), "if acts of murderous cruelty could be arranged on a con-

tinuum, the phrase 'extreme cruelty' would delineate the outermost portion of the range."

The record in this case does not establish behavior at the outermost portion of the range of cruelty that would constitute the aggravating circumstances of extreme cruelty. The savagery of this killing is unquestioned, but the evidence clearly points to the fact that St. Pierre's acts, unlike those in other cases where our courts have imposed life sentences, did not involve torture or other gratuitous suffering inflicted on the victim. *See e.g., State v. Shortsleeves,* 580 A.2d 145 (Me.1990); *State v. Dechaine,* 572 A.2d 130 (Me.1990); *State v. Lane,* 532 A.2d 144 (Me.1987). According to the testimony of a pathologist who reviewed the medical examiner's report, Grover was probably unconscious fairly quickly as a result of one or several of the blows St. Pierre inflicted to her head. Moreover, the manner in which the victim's body was deposited in the river did not add to the suffering of the victim. Based on the record before us we conclude that St. Pierre's murder of Carlene Grover was not aggravated by extreme cruelty.

## IV.

■ It becomes our responsibility to determine the appropriate sentence in this case. Although not a factor in the cruelty of the offense, we agree with the sentencing court's rejection of any extenuating circumstances. St. Pierre has committed a brutal murder. Nevertheless, the State apparently recognized the defendant's youth and his prospects for rehabilitation by its recommendation of 50 years. In *Shortsleeves* we summarized the legislative changes in the punishment authorized for murder during the past fifteen years. *Shortsleeves,* 580 A.2d at 149. In *Haberski* the Appellate Division described the pattern of sentencing for murder during the first eleven years under the Criminal Code, concluding that the average of sixty-six sentences was approximately 34 years. *Haberski,* No. AD–85–54 at p. 5 n. 3. Giving consideration to all of these factors, we conclude that a term of forty-five years is

an appropriate sentence, warranted by the seriousness of the offense, but more consistent with other sentences.

The entry is:

Judgment of conviction affirmed.

Sentence of life imprisonment amended by substituting therefor a sentence of forty-five years in the custody of the Commissioner of the Department of Corrections.

All concurring.