2009 ME 44

**STATE of Maine**

v.

**Michael HUTCHINSON.**

Supreme Judicial Court of Maine.

Argued: Jan. 14, 2009.
Decided: April 30, 2009.

Robert C. Andrews, Esq. (orally), Portland, for Michael Hutchinson.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Atty. Gen. (orally), Lisa J. Marchese, Asst. Atty. Gen., Augusta, for the State of Maine.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

LEVY, J.

[¶ 1]   This appeal presents the question of whether a provision in the DNA Data Base and Data Bank Act, 25 M.R.S. §§ 1571–1578 (2008),[1] that compels certain

---

1.   We note that Hutchinson's sample was collected in 2004, and the Maine DNA Data Base

criminal defendants to provide DNA samples following a conviction violates those defendants' constitutional right to be free from unreasonable searches and seizures. Because we conclude that it does not, and we are also not persuaded by the other appellate issues he presents, we affirm Michael Hutchinson's conviction of murder, 17–A M.R.S.A. § 201(1)(A) (1983),[2] and his sentence of life imprisonment imposed by the Superior Court (Cumberland County, *Warren, J.*).

## I.  BACKGROUND

[¶ 2]  This case involves a brutal sexual assault and murder.  In May 1994, a twelve-year-old girl awoke in the Bridgton home she shared with her mother to the sound of her mother screaming repeatedly, "No!" in a loud, terrified voice.  She heard a drawer opening in the kitchen, and knives clinking against each other, followed by "a highly repetitive thudding sound with a liquid component to it" and a male voice grunt heavily at the end; she then heard the sound of the phone off the hook.  Eventually she left her bedroom and caught sight of her mother's body on the floor.  She tried to dial 911 but none of the phones were working, so she went outside and began knocking on her neighbors' doors.  When none of her neighbors answered, she continued down the road to a local restaurant where the owners lived upstairs, and they called the police.

[¶ 3]  When investigators arrived at the victim's house, they observed blood in the kitchen and living room areas, and noticed some footprints had been left around the victim and in other areas. The victim's body was found lying on the kitchen floor, on her right side, and her head was covered in blood.  The lead forensics investigator noticed that there were blood droplets on the victim's hip and leg that appeared different from the victim's blood, as well as some additional drops on the kitchen floor.  The shape of the drops indicated that "a blood source higher than she was on the floor was dropping blood" on the victim.  There was also blood in the living room and on some of the furniture.  Blood samples were taken from different areas of the kitchen and living room, along with fiber samples from the carpet (with and without blood) and impressions of the footprints.

[¶ 4]  The medical examiner found that the victim had a fatal stab wound in the chest, approximately fifty stab wounds to her head and face, and additional superficial wounds on her arms and wrists, which suggested she had been warding off an attack.  The examiner also observed tears and slight bleeding around the anus area, consistent with blunt force from a penis, but no evidence of a lubricant; and the examiner testified that there was likely pain associated with these tears.  The state of the tears indicated they could have been made any time between some minutes or up to four hours before the victim's death.  Sperm cells were detected in the victim's anus, but nowhere else.

[¶ 5]  The sperm and blood samples were subjected to forensic analysis by the

---

and Data Bank Act was amended between 2004 and 2008, but these amendments are not material to our discussion here.  *See* P.L. 2005, ch. 329, § 5 (effective Sept. 17, 2005) (codified at 25 M.R.S. § 1575(2–A) (2008)); P.L. 2007, ch. 294, § 1 (effective Sept. 20, 2007) (codified at 25 M.R.S. § 1574–A (2008)).

2.  Title 17–A M.R.S.A. § 201(1)(A) (1983) has since been amended in ways not material to Hutchinson's conviction.  P.L. 2001, ch. 383, § 8 (effective Jan. 31, 2003) (codified at 17–A M.R.S. § 201(1)(A)(2008)).

FBI, which determined that the DNA in the sperm samples matched that found in the drops of blood on the victim's leg. The DNA however, did not match samples from any of those persons whom the State suspected in the case. The unidentified DNA samples thereafter remained catalogued in a state data base and the case remained unsolved for years.[3]

[¶ 6] In 2003, Michael Hutchinson pleaded guilty to criminal threatening with a dangerous weapon (Class C), 17–A M.R.S. § 209 (2008),[4] and received a sentence of five years of imprisonment, with all but six months suspended, and four years of probation. Hutchinson was ordered to give a DNA sample pursuant to 25 M.R.S. § 1574(1), (5)(B), which requires that persons convicted of certain crimes provide a sample of their DNA. Hutchinson's sample was subsequently checked against the DNA samples in the state data base of unsolved forensic cases in Maine, and Hutchinson's profile came up as a match with the DNA samples taken from the body of the victim in this case.

[¶ 7] Without revealing the existence of the DNA evidence to Hutchinson, police interviewed him about the 1994 murder. He denied any involvement and claimed he had never met the victim. During a second interview in which the DNA match was revealed to Hutchinson, the officer observed that Hutchinson had a scar on his right hand. Hutchinson claimed he had cut his hand at a friend's workplace.

[¶ 8] A search warrant was obtained, and a new sample of Hutchinson's DNA was taken along with a foot impression. The new DNA sample confirmed the match. Additional DNA testing was done on the carpet samples that had been retrieved from the scene, and DNA from sperm detected on the carpet also matched Hutchinson's. Samples of the blood that had been found in front of the kitchen sink and on the kitchen floor were also a match. Subsequently, police determined that Hutchinson had lived only a few blocks from the victim's home at the time of the murder, and that Hutchinson's parents had also lived nearby.

[¶ 9] Hutchinson was indicted and charged with murder. Prior to trial, Hutchinson filed a motion to suppress the DNA evidence, arguing that the initial collection of his DNA sample pursuant to the statute had been in violation of the federal and state constitutional guarantees against unreasonable searches and seizures. At the hearing on this issue, testimony was received from the probation official who obtained the initial sample from Hutchinson, the analyst who made the match, and two of the investigating officers. The court upheld the DNA collection statute, finding it to be constitutional under the totality of the circumstances, stating:

> [P]ersons convicted of felonies and persons placed on probation have a reduced expectation of privacy.... In addition, the taking of a DNA sample by swabbing the inside of Hutchinson's cheek constituted a fairly minor intrusion. The governmental interest in monitoring probationers and other persons convict-

---

3. By 1998, the Maine State Police Crime Laboratory had acquired capacity to do its own DNA analysis, and at that time ran the tests again, confirming the FBI's results.

4. The record reflects that Hutchinson pleaded guilty to "criminal threatening with a dangerous weapon, Class C", but we note that pursuant to 17–A M.R.S. § 209(2) (2008), criminal threatening is ordinarily a Class D crime. However, we assume that the Class C designation was made pursuant to 17–A M.R.S.A. § 1252(4) (1983), which has since been amended. See P.L. 2005, ch. 527, § 17 (effective Aug. 23, 2006) (now codified at 17–A M.R.S. § 1252(4) (2008)). The relevant language remains unchanged.

ed of serious crimes, in deterring recidivism, and in investigating unsolved crimes is significant enough to outweigh any privacy interest in this context.

[¶ 10]   At the trial, the jury received testimony from the victim's daughter, now a grown woman, and, through several additional witnesses, was presented with the array of DNA evidence that tied Hutchinson to the murder.  It also received testimony that the footprint impressions from the kitchen and the living room all had one outsole design, and the impression taken from Hutchinson's foot indicated that it fit within that outsole.

[¶ 11]   Hutchinson testified in his own defense.  He admitted that he had actually met the victim about a year before her murder at a local bar, that they had had sex a couple of times before, and that she had invited him to come over on the day of her death.  Hutchinson said that when he arrived, he and the victim had consensual anal and vaginal intercourse, but that another person later entered the house, knocked him out, and stabbed the victim. Hutchinson further testified that his hand had been cut during his scuffle with the person, and that he had stepped over the victim when he ran from the house in order to escape the unknown intruder. Hutchinson claimed that he did not come forward and tell the police what had happened because he was so ashamed that he had run from the house.

[¶ 12]   The State countered with expert testimony that the blood drops found on the victim's leg were consistent with a person standing over the victim.  Further, investigators had observed no pooling or smearing on the floors to suggest that anyone other than the victim had been lying there bleeding for a period of time, or had pushed themselves off the floor with a bloody hand.

[¶ 13]   The jury found Hutchinson guilty.  At the sentencing hearing, the court determined the basic sentence to be life in prison based on two factors found by a preponderance of the evidence:  extreme cruelty and sexual assault.  Hutchinson was sentenced to life in prison and ordered to pay $3000 in restitution.

[¶ 14]   This appeal followed.

## II.   LEGAL ANALYSIS

[¶ 15]   This appeal presents three primary questions.  First, we examine whether section 1574(5) of Maine's DNA Data Base and Data Bank Act, 25 M.R.S. §§ 1571–1578, requiring the collection of DNA samples from persons convicted of serious crimes as enumerated by the statute, violates the Fourth Amendment of the United States Constitution and article I, section 5 of the Maine Constitution, prohibiting unreasonable searches and seizures.  Second, we discuss whether Maine's murder sentencing scheme violates the Sixth Amendment right to a trial by jury as that right has been applied in a line of decisions beginning with *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).  Third, we review whether the court's decision, as part of its *Hewey* sentencing analysis, to set the "basic sentence" at life in prison comports with the applicable sentencing principles.  *State v. Hewey*, 622 A.2d 1151, 1154 (Me.1993).[5]

---

5.   Hutchinson makes three other arguments on appeal.  Specifically, he contends that the court erred when it: (1) refused to force the State to accept Hutchinson's stipulation that he was in the victim's home on the night of the murder and that his DNA had been found on the victim, and instead allowed evidence of anal intercourse to be introduced; (2) excluded evidence suggesting the victim had been open to similar sexual acts with another person; and (3) excluded evidence of an alternative suspect.  We find these contentions to be

## A. Maine's DNA Data Base and Data Bank Act

[¶ 16] Maine's DNA Data Base and Data Bank Act (DNA Data Act), first enacted in 1995,[6] requires persons convicted of specified serious crimes [7] to provide biological samples for DNA testing and analysis, and for inclusion in federal and state data bases. Hutchinson challenges section 1574 of the DNA Data Act, which specifically authorized the collection of a DNA sample following his conviction of a Class C crime in 2003. *See* 25 M.R.S. § 1574(1), (5).[8] The sample was collected from Hutchinson's inner-cheek using a swab similar to a Q-tip in 2004, while Hutchinson was on probation, and the DNA profile developed from the sample was eventually entered into a data base of Maine offenders at the Maine State Police Crime Lab.

[¶ 17] Hutchinson contends that because the principal rationale for the DNA Data Act is the collection of evidence with which to solve crimes, the collection of his DNA sample was a suspicionless search that cannot be justified under any exception to the requirements of probable cause and a warrant guaranteed by the Fourth Amendment to the United States Constitution and article I, section 5 of the Maine Constitution.

[¶ 18] The Fourth Amendment and article I, section 5 of the Maine Constitution guarantee "[t]he right of the people to be secure ... against unreasonable searches and seizures." U.S. Const. amend. IV.[9] The collection of DNA from a

---

without merit and do not address them further. Hutchinson also maintains that the court erred in imposing restitution, a contention we similarly decline to address.

6. *See* P.L. 1995, ch. 457, § 1 (effective Sept. 29, 1995). The DNA Data Act has since been amended, and is now codified at 25 M.R.S. §§ 1571–1578(2008).

7. For example, material to our discussion here, pursuant to section 1574(5), applicable offenses for persons convicted on or after October 1, 2001 include:

one or more of the following offenses or an attempt of one or more of the following offenses:
A. Murder;
B. A class A, B, or C crime;
C. Sexual abuse of a minor;
D. Unlawful sexual contact;
E. Visual sexual aggression against a child;
F. Sexual contact with a child under 14 years of age;
G. Solicitation of a child by computer to commit a prohibited act; or
H. Any lesser included offense of any crime identified in paragraphs A to G if the greater offense is initially charged. "Lesser included offense" has the same meaning as in Title 17-A, section 13-A.
25 M.R.S. § 1574(5).

8. Specifically, section 1574(1) requires that:

A person convicted ... on or after October 1, 2001, of a crime listed in subsection 5 shall submit to having a DNA sample taken and at the time of sentencing the court shall enter an order directing that the DNA sample be taken. If the convicted person's sentence includes a straight term of imprisonment or a split term of imprisonment, the DNA sample may be taken at any time following the commencement of the straight term or initial unsuspended portion of the term of imprisonment. If the convicted person's sentence includes a period of probation but no immediate imprisonment, the DNA sample may be taken at any time following the commencement of the probation period as directed by the probation officer. If the convicted person's sentence includes a period of probation, the court may attach the duty to submit to having a DNA sample taken as a condition of probation.
25 M.R.S. § 1574(1). Applicable offenses in section 5 include a Class C crime. 25 M.R.S. § 1574(5)(B), *supra* note 7.

9. The text of article I, section 5 of the Maine Constitution provides that "[t]he people shall be secure ... from all unreasonable searches and seizures." Me. Const. art I, § 5. Although this provision and the corresponding

person constitutes a "search or seizure" within the meaning of both provisions. *See United States v. Amerson,* 483 F.3d 73, 77 (2d Cir.2007). The key inquiry under these provisions is whether the search or seizure is reasonable, and "[t]he reasonableness of a search is generally assured through an officer's procurement of a warrant issued upon the demonstration of probable cause, or through the individual's consent to the search." *State v. Cormier,* 2007 ME 112, ¶ 14, 928 A.2d 753, 758 (citations omitted). "[A] warrantless search is generally unreasonable unless it was conducted pursuant to a recognized exception to the warrant requirement." *State v. Melvin,* 2008 ME 118, ¶ 6, 955 A.2d 245, 247. Pursuant to section 1574, neither probable cause nor a warrant is required for the collection of DNA from persons who fall within the ambit of the statute.

[¶ 19] Federal and state courts have upheld DNA collection statutes similar to Maine's in the face of Fourth Amendment challenges, but have been divided on the proper constitutional analysis. Some have held that the statutes must meet the criteria for what is known as the special needs exception. This exception has been acknowledged by the Supreme Court, as noted most recently in *Samson v. California,* 547 U.S. 843, 852 n. 3, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006), although the Supreme Court found it unnecessary to address whether a suspicionless search of a parolee fit within the existing special needs exception. This exception applies in circumstances where a special need "beyond the normal need for law enforcement, make[s] the warrant and probable-cause requirement impracticable." *Amerson,* 483 F.3d at 80 (quotation marks omitted); *see also Cormier,* 2007 ME 112, ¶¶ 31–35, 928 A.2d

at 762–63. If a special need is found, we then "balance the privacy interests of the individual against the governmental interests at stake to assess the practicality of the warrant and probable cause requirements." *Cormier,* 2007 ME 112, ¶¶ 29, 36, 928 A.2d at 761, 763. For the reasons that follow, however, we are not persuaded that the special needs exception applies to the searches authorized by the DNA Data Act.

[¶ 20] It is apparent that the DNA data base serves primarily as a tool with which law enforcement officials can investigate and solve crimes. Accordingly, we do not adopt the logic embraced by some courts that DNA data bases are justified for purposes beyond that of "normal" law enforcement because the individual from whom the DNA sample is taken is not, at that time, the subject of an ongoing criminal investigation. *See Amerson,* 483 F.3d at 82–83; *United States v. Hook,* 471 F.3d 766, 773 (7th Cir.2006) (upholding a challenge to the similar federal DNA Act); *State v. Martin,* 955 A.2d 1144, 1152 (Vt. 2008) (upholding a challenge to a similar Vermont DNA statute under the Vermont Constitution); *State v. O'Hagen,* 189 N.J. 140, 914 A.2d 267, 278–81 (2007) (upholding a similar New Jersey DNA statute under the Fourth Amendment and the New Jersey Constitution). Surely normal law enforcement is a broader pursuit than simply collecting and analyzing DNA samples as part of an ongoing criminal investigation, and includes the routine comparison and examination of previously collected, analyzed, and catalogued DNA samples for the purpose of investigating unsolved crimes. As one commentator has stated, "DNA harvesting is undeniably entangled with the normal needs of law enforcement;

provision in the Fourth Amendment of the United States Constitution generally offer identical protection, *State v. Patterson,* 2005 ME 26, ¶ 10, 868 A.2d 188, 191, we have also

recognized that the Maine Constitution may offer additional protections. *See also State v. Melvin,* 2008 ME 118, ¶ 13, 955 A.2d 245, 249–50.

namely, efforts to solve past and future crimes." Meghan Riley, Comment, *American Courts Are Drowning in the "Gene Pool": Excavating the Slippery Slope Mechanisms Behind Judicial Endorsement of DNA Databases*, 39 J. Marshall L.Rev. 115, 144 (2005). The special needs exception should not be stretched so thin as to provide constitutional justification for a DNA data base that, as demonstrated by this case, is a critical tool in the normal law enforcement activity of investigating unsolved crimes.

■ [¶ 21] Other jurisdictions, however, have applied the "totality of the circumstances" balancing analysis in upholding similar statutes. *See State v. Bartylla*, 755 N.W.2d 8, 16 (Minn.2008) (collecting cases). The inquiry under this analysis is, in a sense, less demanding than the special needs exception because it does not require the State to prove the existence of a "special need," and focuses exclusively on whether a search was reasonable "under [the] general Fourth Amendment approach of examining the totality of the circumstances" by balancing the individual privacy and governmental interests at stake. *United States v. Knights*, 534 U.S. 112, 118–19, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (quotation marks omitted). An apparent majority of federal circuit courts have adopted this latter approach when reviewing mandatory DNA collection statutes. *See United States v. Weikert*, 504 F.3d 1, 8–9 (1st Cir.2007) (collecting cases).

[¶ 22] In light of our conclusion that a special needs test does not apply, a balancing of the totality of the circumstances is the only available method of analysis. This conclusion is supported by *Samson v. California*, in which the Supreme Court applied the totality of the circumstances test in upholding a California law that authorized suspicionless and warrantless searches of parolees. 547 U.S. at 847–48, 126 S.Ct. 2193. In that case the Supreme Court balanced the state's substantial interest in being able to subject parolees to searches as a tool to reduce the high rate of criminal recidivism associated with parolees, with the substantially reduced privacy interest of the petitioner, who, as a parolee, "did not have an expectation of privacy that society would recognize as legitimate." *Id.* at 852–53, 126 S.Ct. 2193.

[¶ 23] The circumstances and interests at stake in *Samson* are analogous to those presented here, and the Supreme Court's decision supports the use of the totality of the circumstances test to analyze Hutchinson's claim. *Accord Weikert*, 504 F.3d at 9–11. We turn then to weigh the interests at stake in this case.

[¶ 24] As a convicted felon, the degree of privacy Hutchinson could reasonably expect from governmental intrusions closely associated with his conviction and incarceration is substantially less than that of citizens who do not have histories of convictions and incarcerations. *See Weikert*, 504 F.3d at 12; *see also Knights*, 534 U.S. at 119, 121, 122 S.Ct. 587 (upholding warrantless searches of probationers when coupled with an individualized suspicion); *Samson*, 547 U.S. at 848, 857, 126 S.Ct. 2193 (upholding statute allowing suspicionless searches of parolees under the "totality of the circumstances" test). It is a necessary corollary that individuals who lose their liberty as a consequence of a criminal conviction also lose a large measure of their privacy, including their right to keep personally identifiable information private.

[¶ 25] The extent of the physical intrusion on individual privacy authorized by the DNA Data Act is minor. Obtaining a DNA sample through a cheek swab is no

more intrusive than taking a fingerprint.[10] Moreover, the impairment of privacy rights by the State's use of the analysis of the DNA sample is mitigated by safeguards, contained in the DNA Data Act, that minimize the risk that personally identifiable information can be inappropriately mined or released.[11] In addition, the DNA Data Act protects against the State's retention of the DNA profiles of persons who are ultimately determined to have been wrongfully convicted.[12]

[¶ 26] In sum, at the time the State conducted its suspicionless and warrantless search of Hutchinson in 2003, his privacy interests were at their nadir. There is little if anything to suggest that society would expect that Hutchinson should have been afforded privacy protections upon his conviction and incarceration against physically unobtrusive searches of his body for personally identifying characteristics such as his fingerprints and DNA. *See Martin*, 955 A.2d at 1157 ("The data retained in the [DNA] data base serve only to prove identity, like a fingerprint. The information in the data base, then, is not information defendants can reasonably expect to keep private as convicted felons." (citation omitted)).

[¶ 27] By contrast, the State's interest in obtaining the DNA of persons like Hutchinson, convicted of felony crimes and subject to continued state supervision through incarceration or probation, is substantial. The personally identifiable information maintained as a result of the DNA Data Act provides the State with a tool to monitor and identify these offenders. Specifically, the records may be utilized "for identification purposes that further official criminal investigations"; the FBI may access the records for purposes of storage and maintenance of CODIS (the equivalent federal data base); medical examiners and coroners may use the records to identify remains; and, equally significant, persons identified and charged with a criminal offense or a juvenile crime as a result of DNA records may access them, presumably for purposes of exoneration. *See* 25 M.R.S. § 1577(1), (2). The records may also be released "to advance DNA analysis methods and support statistical interpretation of DNA analysis ... if personal identifying information is removed." 25 M.R.S. § 1577(3). These uses advance the goals of deterring recidivism, solving crimes, exonerating the innocent, and preserving public safety.

10. Blood tests are no longer necessary. *See* P.L. 2003, ch. 393, §§ 3, 4 (effective Sept. 13, 2003) (codified at 25 M.R.S. §§ 1574(1–2), 1575–76); *see also State v. O'Hagen*, 189 N.J. 140, 914 A.2d 267, 279 (2007).

11. Significantly, the record establishes that the DNA samples cannot be used for determining personal characteristics (other than identification with a name), because the testing done at the Maine State Police Crime Laboratory is "completely done on non-coding regions of DNA ... [and] gives no information about the specifics of who that individual is." *See also United States v. Weikert*, 504 F.3d 1, 3–4 (1st Cir.2007); *State v. Martin*, 955 A.2d 1144, 1155 n. 10 (Vt.2008). In addition, like similar statutes in other states, Maine's statutory framework includes safeguards that limit access to the records and criminally penalize the unauthorized dissemination of information in the records. *See* 25 M.R.S. §§ 1577(1), (2), 1578. Upon receipt of the DNA profile, personally identifiable information is removed and the profile is assigned a number. The record matching the number with the identifying information is stored in a separate data base. Further, the records may only be released for statistical interpretation if all personally identifiable information is removed. *See* 25 M.R.S. § 1577(3).

12. The DNA Data Act permits any person to petition the Superior Court for expungement if "the conviction or adjudication justifying the inclusion of the DNA record in the state DNA data base has been reversed or dismissed." 25 M.R.S. § 1577(4).

[¶ 28] There is a strong correlation between offenders who are convicted of serious crimes and the cohort of persons who are most likely to commit new crimes.[13] This is certainly true with respect to offenders who, like Hutchinson, are placed on probation and reportedly have a felony recidivism rate in excess of 40%. *See Knights*, 534 U.S. at 120, 122 S.Ct. 587 (noting a U.S. government report found "that 43% of 79,000 felons placed on probation in 17 States were rearrested for a felony within three years while still on probation"). Further, "it must be remembered that the very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law." *Id.* (quotation marks omitted).

[¶ 29] Thus, the State's interest in harnessing DNA sequencing to permit the future forensic identification of persons who have previously been found guilty of a serious offense is pronounced and fairly meets the description of being extraordinary, as DNA may be the only information a perpetrator leaves at the scene of a crime. In this case, for example, normal law enforcement methods, including voluntary DNA testing of suspected individuals, yielded no information about the killer. Without the DNA data base, it would have been impossible to identify Hutchinson as a person who was present at the scene of the murder for which he stands convicted.

[¶ 30] The balance between Hutchinson's substantially diminished privacy interest and the State's extraordinary interest is not close. We conclude that in light of the safeguards associated with the DNA Data Act, the collection of DNA samples from convicted felons who are subject to state supervision through incarceration or probation, without the protections of individualized suspicion or a warrant, is a reasonable search and seizure.

[¶ 31] Because the State's interest in identifying and monitoring criminals who are convicted may be different for those who are not imprisoned or subject to probation, we do not address the constitutionality of the DNA Data Act as applied to those individuals. Similarly, we offer no opinion as to the constitutionality of the DNA Data Act as applied to juvenile offenders. *See* 25 M.R.S. § 1574(6).

**B. Maine's Murder Sentencing Statute and the Sixth Amendment**

[¶ 32] Hutchinson next argues that Maine's murder sentencing statute encompasses two different sentence ranges, and that the court's imposition of a life sentence, based in part on facts not found by the jury, violates his Sixth Amendment right to trial by jury. Statutory interpretation is reviewed de novo, *State v. Thongsavanh*, 2007 ME 20, ¶ 27, 915 A.2d 421, 427, and we will seek to interpret any statute in a way that is consistent with the constitution. *See Driscoll v. Mains*, 2005 ME 52, ¶ 6, 870 A.2d 124, 126.

[¶ 33] We have recognized that, " '[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' " *Alexandre v. State*, 2007 ME 106, ¶ 15, 927 A.2d 1155, 1159 (quoting *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348). Maine's mur-

---

13. In addressing the rate of recidivism of paroled felons in California in *Samson v. California*, 547 U.S. 843, 853–54, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006), the Supreme Court noted that, in 2005, "California's parolee population ha[d] a 68– to 70–percent recidivism rate," and reiterated that it had previously "acknowledged the grave safety concerns that attend recidivism."

der sentencing statute, 17–A M.R.S.A. § 1251 (Supp.1994),[14] provides in pertinent part, "[a] person convicted of the crime of murder shall be sentenced to imprisonment for life or for any term of years that is not less than 25." Contrary to Hutchinson's assertion, this statutory language unambiguously prescribes a unitary statutory range of twenty-five years to life imprisonment, *see State v. Shortsleeves*, 580 A.2d 145, 149 (Me.1990), and we have previously noted that life in prison is the statutory maximum for *Apprendi* purposes. *See State v. Gauthier*, 2007 ME 156, ¶ 29, 939 A.2d 77, 84; *Libby v. State*, 2007 ME 80, ¶ 10, 926 A.2d 724, 727. It follows that any sentence imposed by a court within that range is constitutionally permissible.

■ [¶ 34] Hutchinson next contends that even if section 1251 facially creates a single sentencing range, in *Shortsleeves* we construed the statute so as to create two separate ranges when we indicated that for a court to impose the maximum end of the range, life imprisonment, the murder must be "accompanied by aggravating circumstances," including for example, "sexual abuse or other extreme cruelty inflicted upon the victim."[15] 580 A.2d at 149–50. Noting that the *Shortsleeves* opinion states that "a life sentence may not be imposed unless there are aggravating circumstances," *id.* at 150, Hutchinson thus argues that his Sixth Amendment rights

were violated because he was given the maximum sentence based on factual findings made by the court, applying the less demanding preponderance of the evidence standard, in accordance with the *Shortsleeves* criteria.[16] In *Libby*, in the face of a similar Sixth Amendment challenge, we upheld the imposition of a forty-year sentence for murder because it was well within the prescribed statutory range, concluding that an offender does not have a Sixth Amendment right to have sentencing facts proved beyond a reasonable doubt if the sentence imposed is less than the statutory maximum. 2007 ME 80, ¶ 10, 926 A.2d at 727. Hutchinson contends that before a court can impose a basic sentence of life in prison, a jury must specifically find beyond a reasonable doubt that one or more of the *Shortsleeves* factors are present.

■ [¶ 35] The Sixth Amendment is not violated by statutes that "permit judges genuinely to exercise broad discretion ... within a statutory range." *Cunningham v. California*, 549 U.S. 270, 294, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007) (quotation marks omitted); *see also Libby*, 2007 ME 80, ¶ 6 n. 9, 926 A.2d at 726 ("[W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.") (quoting *Unit-*

14. This statute has since been amended in ways not material to our discussion. *See* P.L. 1999, ch. 536 § 1 (effective Aug. 11, 2000); P.L. 2005, ch. 88, § B–1 (effective Sept. 17, 2005) (codified at 17–A M.R.S. § 1251 (2008)).

15. The so-called *"Shortsleeves"* factors include: (1) "Premeditation-in-fact"; (2) "Multiple deaths, including situations in which the offender in committing the murder knowingly created a substantial risk of death to several individuals"; (3) "Murder committed by a person who has previously been convicted of homicide or any other crime involving the use

of deadly force against a person"; (4) "Murder accompanied by torture, sexual abuse or other extreme cruelty inflicted upon the victim"; (5) "Murder committed in a penal institution by an inmate of that institution"; (6) "Murder of a law enforcement officer while in the performance of his duties"; and (7) "Murder of a hostage." *State v. Shortsleeves*, 580 A.2d 145, 149–50 (Me.1990).

16. In Hutchinson's case, the Superior Court found two aggravating factors: extreme cruelty and sexual assault.

*ed States v. Booker,* 543 U.S. 220, 233, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)). It is equally acceptable for appellate courts to develop criteria that function to direct how a court should exercise sentencing discretion, permit appellate review of that discretion, and, ultimately, promote a reasonable degree of conformity in sentencing. Indeed, a primary purpose of our review of sentences is "[t]o promote the development and application of criteria for sentencing which are both rational and just." 15 M.R.S. § 2154(4) (2008).

[¶ 36] It was in this supervisory capacity that in *Shortsleeves* we found it "appropriate to provide the sentencing court with broad guidelines for the circumstances in which the harshest penalty, a life sentence, may be imposed." *Shortsleeves,* 580 A.2d at 149. *Shortsleeves* was decided soon after the sentence review statute was first enacted. *See* P.L. 1989, ch. 218, § 5 (effective Sept. 30, 1989). It was in consideration of the broad authority delegated to us by that statute that we adopted, in *Shortsleeves,* the "workable set of criteria for distinguishing life sentences from sentences for a term of years," that had been developed by the Appellate Division's decision in *State v. Anderson and Sabatino,* Nos. 78–37, 78–40 (Me.App. Div. June 30, 1980), prior to the enactment of the statute. Daniel E. Wathen, *Judges on Judging: Making Law the Old Fashioned Way—One Case at a Time,* 52 Ohio St. L.J. 612, 611–12, 616 (1991); *see Shortsleeves,* 580 A.2d at 149–50.

[¶ 37] In accordance with the *Hewey* analysis, "[t]he first step a court must take in determining a sentence is to consider the particular nature and seriousness of the offense." *State v. Bates,* 2003 ME 67, ¶ 25, 822 A.2d 1129, 1135 (quotation marks omitted). "This principle requires the sentencing judge to place a defendant's conduct along a continuum for

the type of criminal conduct involved in order to determine which act justifies the imposition of the most extreme punishment." *State v. Wilson,* 669 A.2d 766, 768 (Me.1996) (quotation marks omitted). Toward this end, "[t]he *Shortsleeves* case provides a *guideline* for placing the particular murder along a continuum of criminal conduct," by identifying those factors that would support the conclusion, at the first sentencing stage, that a life sentence is justified. *Bates,* 2003 ME 67, ¶ 26, 822 A.2d at 1135 (emphasis added).

[¶ 38] Thus, the aggravating factors identified in *Shortsleeves* do not establish two distinct sentencing ranges for murder consisting of a life sentence or a term of incarceration of not less than twenty-five years. Rather, they provide guidance to sentencing courts when crafting a murder sentence at the first stage of the *Hewey* analysis. The Sixth Amendment is not affronted by the development and use of criteria that guide the exercise of sentencing discretion and that promote conformity among sentences, all within a single sentencing range.

## C. Basic Sentence Determination

[¶ 39] Hutchinson also contends that the court misapplied sentencing principle because it failed, when setting the basic sentence at the first stage of the three-part *Hewey* analysis, to explicitly place the circumstances of the murder along a continuum of murders involving the two aggravating factors that were identified: cruelty and, separately, sexual assault. *See Hewey,* 622 A.2d at 1154; 17–A M.R.S. § 1252–C(1) (2008). We review a court's determination of the basic sentence for misapplication of principle. *Wilson,* 669 A.2d at 768.

[¶ 40] In setting the basic sentence, the court considered other similar murder cases, and found that the cruelty exhibited

was comparable to that considered in *Shortsleeves*. *Shortsleeves* involved the beating of a woman in her home, which included hitting her over the head with a club so hard that the club broke in half, hitting her with a frying pan, kicking her, and culminating in her throat being slit and stab wounds to her head, which broke the knife. *See Shortsleeves*, 580 A.2d at 146. The defendant received a life sentence. *Id.* at 148.

[¶ 41] Here, the victim's face was stabbed over fifty times, with sufficient force that the knife tip actually broke off and became embedded in her head, all in addition to the fatal wound she sustained in her chest. At some point during this stabbing, the victim was screaming "No!" The court also found that a sexual assault had occurred, and therefore differentiated the case from others like *State v. St. Pierre*, in which we overturned a life sentence for a murder that, although savage, "did not involve torture or other gratuitous suffering inflicted on the victim" and where the victim was made unconscious early on. 584 A.2d 618, 622 (Me.1990). By contrast, the court found Hutchinson's conduct to be "extremely serious" based on the "simple savagery of the killing," and it described the injuries Hutchinson inflicted on the victim as "butchery."

[¶ 42] The court's analysis leaves little doubt that it considered the crime to be at the upper end of the spectrum of seriousness. Sentencing courts are not compelled to expressly invoke a continuum of seriousness, nor are they required to identify separate continua for each aggravating fact, so long as their analyses reflect that the defendant's crime was considered to be among the most serious ways in which the crime might be committed:

[A]t step one, the sentencing court is not required to elucidate all the possible means by which the defendant's crime may be committed, find which method of commission is worse than the defendant's or which method is the worst possible way of committing the crime, and then assign the basic sentence according to where the defendant's conduct falls on that spectrum. . . . Instead, when the court imposes a basic sentence at or near [the maximum], it does not misapply principle if it finds that the defendant's conduct is "most serious" as compared to other means of committing the crime within that same range.

*State v. Schofield*, 2006 ME 101, ¶ 11, 904 A.2d 409, 414.[17]

[¶ 43] In this case, the court's sentence was the product of a reasoned analysis that was firmly and appropriately rooted in two of the most aggravating attributes of this heinous crime. There was no violation of sentencing principle.

The entry is:

Judgment and sentence affirmed.

---

17. Hutchinson's argument that the same "principle of degree" should have been ap-plied separately to the sexual assault aggravating factor is therefore equally unconvincing.