1997 ME 160

**STATE of Maine**

v.

**Faylene POULIN.**

Supreme Judicial Court of Maine.

Submitted on Briefs April 18, 1997.

Decided July 21, 1997.

---

Geoffrey Rushlau, District Attorney, Leane Zainea, Asst. Dist. Atty., Belfast, for State.

Joseph W. Baiungo, Blake & Hazard, Belfast, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

WATHEN, Chief Justice.

[¶ 1] Defendant, Faylene Poulin, appeals from the judgments entered in the Superior Court (Waldo County, *Marsano, J.*) on jury verdicts finding her guilty of class A manslaughter, in violation of 17–A M.R.S.A. § 203 (Supp.1996),[1] and class C operating under the influence of intoxicants, in violation of 29–A M.R.S.A. § 2411(1), (6) (1996).[2] Defendant argues on appeal that the court erred by admitting the results of her blood-alcohol test and that there is insufficient evidence to support her conviction. We affirm the judgment.

[¶ 2] According to the testimony at the trial, the facts leading to defendant's indictment were as follows: Defendant and a friend, Sara Smith, arrived at defendant's home sometime after 3:30 p.m. on the afternoon of February 7, 1995. Smith departed shortly thereafter with her boyfriend, but left her car, a 1991 Chevrolet Beretta, for defendant to drive if she decided to join them. According to defendant's testimony, she consumed her first beer of the evening at 4:30 p.m. and had two more before leaving to join her friends at the home of Bobby Pooler sometime between 7:30 and 8:30 p.m.

[¶ 3] Defendant also testified that, on arriving at Pooler's residence, she had another beer and a twelve-ounce glass of coffee brandy and milk. At one point, a friend drove defendant back to her home to retrieve more milk and some ice. Defendant testified that she brought another coffee brandy with her "for the road." The two women returned to Pooler's at approximately 9:30 p.m.

[¶ 4] Later, Larry Vaughn asked defendant to take him home and she agreed. Defendant was driving the Beretta when the two left the Pooler residence. Vaughn asked defendant to first stop at the home of some friends, the Theriaults, and she agreed. Defendant testified that she opened a beer while at the Theriaults but only consumed a few sips of that beer. She also testified that the last thing she remembered about leaving the Theriault home was standing in their doorway. She does not remember driving away. None of the Theriaults who testified at trial could remember who drove the Beretta away from their house. Tammy and Carolyn Theriault testified that defendant had the keys in her hand when she left their home a bit before midnight and that it was their understanding that defendant was providing the transportation that evening, not Vaughn. Tammy Theriault also testified that she could tell that defendant had been drink-

---

1. "A person is guilty of manslaughter if that person ... Recklessly, or with criminal negligence, causes the death of another human being...." 17–A M.R.S.A. § 203(1)(A) (Supp. 1996).

2. The relevant portion of the statute applicable at the time of the accident provides:

 1. **Offense.** A person commits OUI, which is a Class D crime, if that person operates a motor vehicle:
 A. While under the influence of intoxicants; or
 B. While having a blood-alcohol level of 0.08% or more.

6. **Aggravated punishment category.** If the State pleads and proves that, while operating a motor vehicle in violation of this section, the operator in fact caused serious bodily injury as defined in Title 17–A, section 2, subsection 23 to another person or in fact caused the death of another person, the offense is a Class C crime. The minimum penalties specified in subsection 5 apply, but the minimum period of suspension must be 18 months unless a longer minimum period applies.

P.L. 1993, ch. 683, § A–2 (codified as amended at 29–A M.R.S.A. § 2411 (1996)).

ing because her voice was slurred, she smelled of alcohol, and she was "kind of loud."

[¶ 5] Paul LaBelle and his brother Russell testified that they were driving home during the early morning hours of February 8. While on Johnson Flats Road in Burnham, they saw headlights in a field and, as they got closer to the lights, saw that a car had gone off the road and was "flipped on its edge," passenger-side down. Paul ran to the car to ascertain if anyone needed help and saw Vaughn, whom he did not know at the time, trapped in the passenger side of the car. He testified that Vaughn appeared to be dead. Other testimony established that Vaughn was wedged between the passenger seat and the car post behind that seat and that his feet were in the passenger occupancy.

[¶ 6] The LaBelles left Vaughn to seek assistance and encountered defendant in the driveway of the house closest to the scene. They asked her if she had been involved in the accident. Defendant stated that she had not, but had just stopped to use the restroom. Paul LaBelle, however, noticed that one of defendant's hands was bleeding and that she had glass and blood in her hair. The brothers put defendant in their truck to warm her up and could smell alcohol on her. Paul ran to get help and Russell stayed with defendant. While waiting for Paul to return, defendant repeatedly questioned Russell about "Sara" and stated that she could not remember who was in the car with her. When Paul returned, the three drove to the scene to await help.

[¶ 7] Paramedics arrived shortly and pronounced Vaughn dead. Christian Andreasen, tending to defendant, testified that she was having trouble breathing and had pain in her ribs. Defendant told Andreasen's partner, Brent Grover, that she had not been wearing a seat belt. Defendant told Andreasen and Grover that she had consumed six beers and four large glasses of coffee brandy that evening and they could smell alcohol on her. In response to questioning on the way to the hospital, defendant stated that she remembered loading a friend into the vehicle, but could not remember where she was sitting or who was driving. Andreasen noticed that defendant's chest was bruised during an examination in the ambulance. Defendant was again examined at the hospital and a blood sample was taken. Trooper Wayne Ireland, present at the hospital, testified that defendant was loud and boisterous, had dilated and glassy eyes, and that he smelled alcohol on her breath. He also testified to a statement by defendant that she had consumed six beers and four glasses of coffee brandy that evening.

[¶ 8] Accident reconstructionist Gregory Morse testified that the steering wheel and column of the Beretta were bent and opined that this was caused by the impact of the driver. He also testified that all the tires on the car were mud and snow tires but that the front tires were not in very good condition. Morse testified that tire problems could have resulted in a pulling to the right during braking but he concluded that handling problems resulting from the tires could not have exclusively caused the accident. Defendant stated at the trial and when questioned earlier by a trooper that she had no difficulty controlling the Beretta during the evening in question.

[¶ 9] Red fibers were found on the steering wheel cover of the Beretta. There was testimony at the trial that defendant was wearing a red sweater at the time of the accident. Christopher Montagna, the forensic chemist who analyzed the trace evidence in the case, testified that the fibers were embedded into the cover and, in his opinion, were transferred to the cover with the use of some force or pressure. He testified that the red fibers were microscopically similar to the fibers found in defendant's sweater and were dissimilar to those found in Vaughn's clothing while fibers found on the passenger-side seat belt buckles were similar to those in Vaughn's clothing. Montagna opined that defendant was driving the car. Andreasen testified that drivers usually have more chest and abdomen injury than passengers, who usually hit the windshield and have neck injuries.[3] He was of the opinion that defen-

3. Vaughn's autopsy revealed that he died from a high cervical spine injury.

dant's injuries were consistent with those typically incurred by a driver.

[¶ 10] There was considerable testimony that the Johnson Flats Road was snow-covered or partially snow-covered on the morning in question and that the accident occurred on a curve. Defendant testified that she was a passenger in a car that had gone off the road near the scene the day before the accident at issue here. Trooper Wright, however, testified that he had no difficulty driving on the road that evening despite the fact that he was travelling at a high rate of speed. He opined that no other vehicle was involved in the accident and that a car, travelling at forty-five miles per hour, the speed limit on the road, should have made the curve.

[¶ 11] Defendant was indicted for class A manslaughter and class C operating under the influence of intoxicants. After a jury verdict of guilty on both counts, defendant was sentenced to twelve years on the manslaughter charge. All but six years of that sentence was suspended and probation was imposed for the remaining six. Defendant received a concurrent five-year sentence and $500 fine for the operating under the influence count and her license was suspended for eighteen months. Defendant now appeals her convictions.

## I.  Blood–Alcohol Test Results

[¶ 12] During the course of his direct examination, Trooper Wright was asked if he received a test result revealing defendant's blood-alcohol level at the time of the accident. Wright responded affirmatively and defendant objected due to an inaccuracy on the face of the blood-alcohol certificate relied on by the witness. The court found that the test result was sufficiently reliable to be admissible pursuant to 29–A M.R.S.A. § 2431(1) and permitted Wright to testify that the blood-alcohol certificate he received indicated that defendant's blood-alcohol level was .15.[4] Wright also testified that, while the certificate purported to reflect defen-

dant's blood-alcohol level on January 8, 1995, defendant's blood was, in fact, drawn on February 8, the date of the accident. In addition, Tracy Nadeau–Horton, named on the certificate as the individual who drew defendant's blood, had previously testified that the sample tested was drawn on February 8.

[¶ 13] Defendant argues on appeal that the court erred by admitting evidence of the blood-alcohol test result at trial. We disagree. The statutory section governing the admissibility of blood-alcohol test results provides:

> **1.  Test Results.** Test results showing drug concentrations or blood-alcohol level at the time alleged are admissible in evidence. Failure to comply with the provisions of sections 2521 and 2523 may not, by itself, result in the exclusion of evidence of blood-alcohol level or drug concentration, unless the evidence is determined to be not sufficiently reliable.

29–A M.R.S.A. § 2431(1) (1996). "We have previously noted the legislative policy in effect since the enactment of the implied consent statute that "blood alcohol test results are admissible unless unreliable." " *State v. Kennedy,* 657 A.2d 773, 774 (Me.1995) (quoting *State v. McConvey,* 459 A.2d 562, 568 (Me.1983)). When a certificate stating a blood-alcohol test result meets certain statutory criteria, that certificate is not only admissible, but is considered prima facie evidence of several things including that "[t]he blood-alcohol level or drug concentration in the blood of the defendant at the time the sample was taken was as stated in the certificate." 29–A M.R.S.A. § 2431(2)(C)(5) (1996). A trial court's determination of the reliability of test results is a question of fact and is reviewed for clear error. *Id.* at 774. Given the testimony of Trooper Wright and Ms. Nadeau–Horton, the court did not clearly err by finding the result to be a sufficiently reliable indication of defendant's blood-alco-

---

4.  The court, while admitting the test results, expressed a willingness to continue the trial and permit defendant to question the state chemist. The court later conditioned the admissibility of the certificate on the testimony of the chemist.

Defendant's case-in-chief consisted of her own testimony. No attempt was made to secure the testimony of the chemist and, thus, the certificate was never admitted.

hol level on the night in question to be admissible.[5]

## II. Sufficiency of the Evidence

 [¶ 14] Defendant challenges the sufficiency of the evidence supporting her convictions, specifically contending that the State failed to prove, beyond a reasonable doubt, that she caused the accident killing Vaughn. Both manslaughter and aggravated OUI require the State to prove that the defendant, either with criminal negligence or recklessness or while operating a motor vehicle under the influence, caused the death of another. The relevant statute provides:

> Unless otherwise provided, when causing a result is an element of a crime, causation may be found where the result would not have occurred but for the conduct of the defendant operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant was clearly insufficient.

17–A M.R.S.A. § 33 (1983).

[¶ 15] The State's proof that Vaughn's death would not have occurred but for defendant's conduct consisted of circumstantial evidence. A conviction may be grounded on circumstantial evidence and is not, for that reason, any less conclusive. *State v. Benner*, 654 A.2d 435, 437 (Me.1995). "The factfinder is allowed to draw all reasonable inferences from the circumstantial evidence." *Id.* It is not necessary for the finder of fact to be able to "eliminate any possible alternative explanation of the evidence; the question is whether such alternative is sufficiently credible in light of the entire record that it necessarily raises a reasonable doubt." *State v. Bowman*, 611 A.2d 560, 562 (Me.1992). We are satisfied, on a review of the entire record, viewing the evidence in the light most favorable to the State, that the jury rationally could have found beyond a reasonable doubt every element of the offense charged. *State v. Marden*, 673 A.2d 1304, 1311 (Me.1996).

**5.** At trial, defendant did not object to the fact that Trooper Wright and not the state chemist was testifying to the test result. We conclude that any error committed in permitting Wright to testify as to the result does not rise to the level of obvious error. *C.f. State v. Mendros*, 622 A.2d 1178, 1179 (Me.1993).