2007 ME 118

**STATE of Maine**

**v.**

**Douglas A. DYER.**

Supreme Judicial Court of Maine.

Argued: May 23, 2007.
Decided: Aug. 23, 2007.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Atty. Gen. (orally), Andrew Benson, Asst. Atty. Gen., Augusta, for State.

Steven C. Peterson (orally), West Rockport, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS, LEVY, SILVER, and MEAD, JJ.

CALKINS, J.

[¶ 1] Douglas A. Dyer appeals from convictions for murder, 17–A M.R.S. § 201(1)(A) (2006), and attempted murder (Class A), 17–A M.R.S. §§ 152(1)(A), 201(1)(A) (2006), entered in the Superior Court (Knox County, *Studstrup, J.*), following a jury trial. Dyer argues that the court abused its discretion by denying his motion for a change of venue and by declining to admit into evidence his recorded police interview.[1] We affirm the judgment.

## I. BACKGROUND

[¶ 2] Based on the evidence at trial, the jury could have found the following facts. Dyer began working in 2002 as a truck driver for Vinalhaven Transportation, a company owned by Allison and Brandon Small, a married couple.

[¶ 3] Dyer and Allison Small began a love affair about six months after Dyer started working for the company. Dyer was in love with Allison, but Allison be-

---

1. We do not discuss Dyer's contention on appeal concerning prosecutorial misconduct. Our review of the record demonstrates no obvious error. We also do not discuss Dyer's argument that the court erred in dismissing a juror, who became upset during the presentation of the evidence, as our review of the record reveals no error.

came conflicted about whether she wanted to be with Dyer or her husband. On January 26, 2005, Allison gave Dyer a letter telling him that she was ending the affair because she wanted to save her marriage. The next day Dyer telephoned her repeatedly, and they made a plan to meet the following morning, January 28, at the Vinalhaven Transportation office in Rockland.

[¶ 4] Allison and Brandon Small went to the office building on January 28, and Allison went inside while Brandon waited in the car. After a half-hour Allison came out and told Brandon that everything was fine and he should leave to run some errands. Brandon left and returned thirty to forty-five minutes later. He waited another fifteen minutes or so, when he heard a scream and a loud noise. He saw Allison run out of the building and then saw Dyer exit the building and shoot at Allison, who fell down. Dyer shot in Brandon's direction but missed him. Dyer shot Allison again and then drove away in his truck. The police arrived, and Allison was declared dead at the scene. She had three gunshot wounds: one in the wrist and two in the torso.

[¶ 5] Dyer went to his mother's former place of employment, Electrotech, and called a friend, who arrived to pick him up. Two Electrotech employees saw Dyer and did not think that he seemed emotional. However, the friend described Dyer, who had a history of a previous suicide attempt, as extremely upset and suicidal. Ultimately, Dyer asked the friend to take him to the police station so he could turn himself in. At the police station, two detectives interviewed Dyer.

[¶ 6] Dyer testified at trial that shortly after Allison arrived at the Vinalhaven Transportation office on January 28, they hugged and cried. After a brief time, Allison went outside to talk to her husband and then returned. Thereafter, Dyer went out to his truck and brought back into the office his leather jacket, rifle, and duffle bag. He put a shell in the gun, held it to his head with his thumb on the trigger, and told Allison that she would be the last person to see him alive. Dyer testified that Allison tried to talk him out of committing suicide and asked him to kiss her. When he bent down to do so she grabbed the barrel of the gun, and they struggled with the gun. During the struggle she screamed and a shot was fired. Allison ran outside, and Dyer followed with the gun in his hands. According to Dyer, as he reached the door, it started to swing shut, and he used the gun to push the door. The gun fired again, and he went outside. He saw Allison running toward the vehicle and saw Brandon exit the vehicle. Dyer slipped and fell, and the gun fired a third time. He saw Allison fall after the third shot.

[¶ 7] Dyer testified that when he got back up, he saw Brandon, who looked like he was doing something in the vehicle. Dyer discharged a warning shot in Brandon's direction, and Brandon ran away. Dyer then walked over to Allison, told her he was sorry, and put the gun to his head. He pulled the trigger, but it did not fire. He then drove to Electrotech and called his best friend. Dyer testified that he never intended to kill Allison and never aimed the gun at her or Brandon.

[¶ 8] Dyer was indicted for the murder of Allison Small and the attempted murder of Brandon Small. He filed a motion to change venue from Knox County because of pretrial publicity, and the court denied the motion. Following jury selection, Dyer renewed the motion to change venue, and it was denied. During his case-in-chief, Dyer requested that the court admit the audiotape of his interview by the detectives. The court denied the request, except for allowing a small portion of the

tape to be played on which Dyer could be heard to scream when he was told that Allison was dead. Following his cross-examination by the State, Dyer renewed his request that the entire audiotape or additional portions be admitted, and the court denied the request.

[¶ 9] The jury found Dyer guilty of the murder of Allison Small and the attempted murder of Brandon Small. Dyer made post-trial motions for acquittal and a new trial on the grounds of pretrial publicity and the court's refusal to admit his recorded interview with the detectives. The motions were denied.

[¶ 10] Dyer was sentenced to forty years for murder and a consecutive twenty years for attempted murder.

## II. DISCUSSION

### A. Change of Venue

■ [¶ 11] Prior to trial, Dyer moved for a change of venue based on the pretrial publicity. No documentation or affidavits as to pretrial publicity were filed with the motion, and the record does not reveal any evidence or factual findings on the issue prior to trial. The court denied Dyer's motion.

[¶ 12] At the start of jury selection there were 130 potential jurors, but six or seven were from Vinalhaven and were excused from the pool because they needed to leave early to catch the last ferry. The court asked the members of the venire a number of questions, including whether they had heard anything, watched anything, seen anything, or knew anything about the January 2005 incident. The court then questioned, individually at sidebar, each of the eighty-eight people who had responded affirmatively. Each was asked (1) the source of their information on the case; (2) what they had heard or read; (3) whether they had discussed it with anyone; (4) whether they had a present opinion concerning Dyer or the charges against him

based on what they had heard or read; and (5) whether what they had heard or read might interfere with their ability to render a fair and impartial verdict. The court gave the State and Dyer the opportunity to ask follow-up questions. The court struck for cause each person who indicated that he or she would not be able to render a fair and impartial verdict.

[¶ 13] After the State and Dyer made their challenges for cause, fifty-one individuals were left. The selected panel included seven jurors who had responded affirmatively when they were asked if they had heard or read anything about the case. All seven, however, had said that the information did not affect their ability to render a fair and impartial verdict. Dyer had not sought to strike any of these seven for cause. Following jury selection and after trial, Dyer renewed his motion for change of venue, and the court denied it.

■ [¶ 14] We review a court's decision on a motion for a change of venue for abuse of discretion. *State v. Grant,* 418 A.2d 154, 158 (Me.1980). A change of venue is required when the pretrial publicity is so great that a defendant cannot obtain a fair and impartial trial. *See State v. Chesnel,* 1999 ME 120, ¶ 5, 734 A.2d 1131, 1134. When the publicity of a case is extensive and "so taints the atmosphere surrounding the trial," prejudice is presumed, and the defendant does not have to show actual prejudice. *Id.* However, when, as here, the defendant does not demonstrate that the publicity was extensive or has tainted the atmosphere of the trial, actual prejudice must be shown before we will vacate a judgment. *See id.* ¶¶ 5–6, 734 A.2d at 1134.

■ [¶ 15] When determining actual prejudice, we look to whether any of the selected jurors expressed any notions in regard to guilt or innocence and whether they "expressed a willingness to be fair

and impartial." *State v. Clark*, 386 A.2d 317, 321 (Me.1978). We also examine whether any members of the final jury panel were challenged by the defendant for cause. *Id.* If not, we view this as "strong evidence that [the] defendant was convinced that the jurors were not biased and had not formed any opinions as to guilt." *Id.* (quotation marks omitted).

[¶ 16] When examining actual prejudice, "the focus is not on the number of jurors who know of the case or the ratio of the jurors who know of the case to the panel as a whole, but [is on] the impartiality of the available panel members...." *Chesnel*, 1999 ME 120, ¶ 6, 734 A.2d at 1134; *see also State v. Littlefield*, 374 A.2d 590, 595 (Me.1977) (finding no actual prejudice where forty-seven of fifty-five potential jurors had prior knowledge of the charges, but none of the selected jurors had formed an opinion based on the pretrial publicity); *State v. Ifill*, 349 A.2d 176, 180–81 (Me. 1975) (finding no actual prejudice where thirty-nine of fifty potential jurors expressed pretrial knowledge of the case, but none of the jurors selected showed any prejudice).

[¶ 17] Although seven jurors in this case were exposed to pretrial publicity, they indicated that they could be fair and impartial in evaluating the evidence of the case, and none had any preconceived notions of guilt or innocence. Furthermore, none of the jurors ultimately selected were ones that Dyer sought to strike for cause. We conclude that Dyer was not denied his constitutional right to a fair and impartial jury, and the court did not abuse its discretion in denying his motion.

## B. Admissibility of Audiotape

[¶ 18] On the day of the murder, after Dyer turned himself in to the police, he was interviewed at the police station by two detectives, and an eighty-minute audiotape exists of that interview. Dyer offered the audiotape into evidence, and the State objected on grounds of relevancy and hearsay. Dyer explained that the reason for offering the tape was not for the truth asserted therein, but because it would show Dyer's state of mind. The court ruled that the portion of the tape in which Dyer could be heard emitting a "primal scream" upon learning that Allison was dead, would be admitted. The court concluded that the portion would demonstrate Dyer's state of mind and that it was not necessary to play the whole tape in order to show his state of mind.[2] The court excluded all of the tape except the following portion, which was admitted during Dyer's direct examination of one of the detectives:

Dyer: Can I ask you something?

Detective: Uh-huh

Dyer: Is Allison okay?

Detective: Allison is not okay. No, she's not.

Dyer: Is she not with us anymore?

Detective: She is not. She is deceased.

Dyer: (Crying) Oh my God. (Crying) Oh, God. Oh, my God.

[¶ 19] Dyer's testimony on direct examination contained his version of what had transpired at the office. He testified that he took the firearm into the office with the intention of killing himself and that he never aimed the firearm at Allison or Brandon. He said that he never intended "it" to happen, meaning the shooting. He testified that he told the police that it was an accident. He also spoke of his history of depression and his suicide attempt three weeks before Allison was shot.

---

**2.** The audiotape is inaudible in various places, and the transcript of the audiotape contains "(inaudible)" in numerous places. However, this fact was not mentioned as a basis for excluding the tape. The tape also contains a number of long pauses.

[¶ 20] On cross-examination, the State asked two questions about what had been said at the taped interview. The State asked Dyer if he denied telling the detectives that he had never said anything to Allison about killing himself that day, and he responded "yes." The audiotape of the interview reveals that one of the detectives asked Dyer if he told Allison that he was going to kill himself, and Dyer said that he did not tell her that.

[¶ 21] The State also asked Dyer if it was true that he had failed to tell the detectives that the shooting was an accident. He answered that he "can't remember everything that I said, but I'm pretty sure that I did say it was accidental." A review of the transcript of the audiotape shows that Dyer did not use the word "accident," although he told the detectives that he did not want to hurt Allison, that he "never meant for this to happen," and that "a mistake was definitely made today."

[¶ 22] After the cross-examination, Dyer again moved to admit the entire audiotape because of the references that the State made to the interview during the cross-examination. Dyer also requested, in the alternative, to admit certain specified portions of the tape. Specifically, he wanted the portions in which Dyer said that he never intended to hurt Allison, and that "none of this was suppose[d] to happen." He further offered three portions of the tape in which Dyer had suggested that he wanted to commit suicide.

[¶ 23] Dyer contended at trial that these several portions of the tape were prior consistent statements and he ought to be "allowed to bring [this] out to show that [Dyer] in fact was telling the same story to the police back at that time." [3] The State again objected to the tape and to any other portions of it being admitted, and the court sustained the objection.

■ [¶ 24] On appeal, Dyer's sole contention regarding the audiotape is that the doctrine of completeness requires that the entire tape should have been admitted.[4] We review the determination of a court to admit or exclude a party's statement for abuse of discretion. *State v. Woodward,* 617 A.2d 542, 544 (Me.1992).

■ [¶ 25] M.R. Evid. 106 is the rule that embodies the doctrine of completeness. Rule 106 states that when part of a statement is used by one party, the court, on the request of the adverse party, may require that the rest of the statement, or any part of it, be admitted if in fairness it ought to be considered.[5] "When the State utilizes a portion of a criminal defendant's statement to create an inculpatory impression, fairness demands that the defendant be afforded the opportunity to immediately place at least that portion in an exculpatory context pursuant to Rule 106." *Woodward,* 617 A.2d at 544.

■ [¶ 26] There were two questions on cross-examination in which the State referred to what Dyer said to the detectives during the interview. When the State

---

**3.** Dyer did not mention or identify any "express or implied charge against the declarant of recent fabrication or improper influence or motive," M.R. Evid. 801(d)(1), which is necessary for the admission of a prior consistent statement.

**4.** He has not argued to us that the audiotape or portions of it are admissible as prior consistent statements. M.R. Evid. 801(d)(1).

**5.** M.R. Evid. 106 states:

When a writing or recorded statement or part thereof is utilized in court by a party, an adverse party has the right upon request to inspect it. The court on motion of the adverse party may require the introduction at that time of the writing or recorded statement or any part thereof or any other writing or recorded statement which ought in fairness to be then considered.

asked Dyer if he denied telling the detectives that he had told Allison that he was not going to shoot himself, the State may have been trying to discredit Dyer's claim that he took the gun to the office to shoot himself rather than Allison. However, the State's question was so replete with negatives that it was not understandable and likely did not create any impression at all. It was not an abuse of discretion for the court to refuse to admit exculpatory portions of the tape to negate the State's attempt.

■ [¶ 27] However, the State's question to Dyer asking if it was true that he had not told the detectives that the shooting was an accident may have been a more successful attempt to create a false impression. Dyer should have been allowed, on his redirect examination, to place into evidence the exculpatory portions of the audiotape that directly refuted the inculpatory impression created by the State. The court should have admitted the portions of the tape in which Dyer told the detectives that he never intended to hurt Allison, and that "none of this was suppose[d] to happen."

■ [¶ 28] Nonetheless, the error in excluding these portions of the audiotape is a harmless error that must be disregarded because it is highly probable that the error did not affect the jury's verdict. M.R. Evid. 103(a); M.R.Crim. P. 52(a); *Woodward*, 617 A.2d at 544. The jurors heard Dyer repeat several times to them that he never intended "it," referring to the shooting, to happen. He also testified that he believed he told the detectives it was an accident. The State did not attempt to impeach him on this point, and his answer stood unrefuted. In light of Dyer's testimony, the failure to admit other portions of the tape was harmless.

The entry is:

Judgment affirmed.