2009 ME 127

STATE of Maine

v.

Richard DWYER.

Supreme Judicial Court of Maine.

Argued: Sept. 16, 2009.
Decided: Dec. 22, 2009.

470

George A. Hess, Esq. (orally), Auburn, ME, for Richard Dwyer.

Janet T. Mills, Attorney General, Lisa J. Marchese, Asst. Atty. Gen., Donald W. Macomber, Asst. Atty. Gen. (orally), Augusta, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

LEVY, J.

[¶ 1] Richard Dwyer appeals from a judgment of conviction entered by the Superior Court (Androscoggin County, *Delahanty, J.*) after a jury verdict finding him guilty of murder, 17–A M.R.S. § 201(1)(A) (2008);[1] gross sexual assault (Class A), 17–A M.R.S. § 253(1)(A) (2008);[2] and robbery (Class A), 17–A M.R.S. § 651(1)(D) (2008).[3] The court sentenced Dwyer to life on the murder count, and concurrent terms of thirty years on the Class A counts. We affirm the judgment and Dwyer's sentence.

## I. BACKGROUND

[¶ 2] Viewing the evidence admitted at trial in the light most favorable to the State, *see State v. Bruzzese*, 2009 ME 61, ¶ 10, 974 A.2d 311, 313, the jury could have found the following facts. In October 2007, the victim, age thirty-eight, lived with her daughter in Lewiston and was approximately eight months pregnant. The victim and Dwyer were co-workers at a credit-card-related business in Lewiston. The victim was without a car, and Dwyer volunteered to assist her in getting a car.

[¶ 3] On October 23, the victim received a note from Dwyer and then told another co-worker that the car was out in the parking lot, and she was going to drive it home. The victim held up a check and told her co-worker, "I need to go cash this and then I'm going to give him the money for the car." The co-worker never saw the victim again. After the victim disappeared, the co-worker asked Dwyer if the victim got the car out of the parking lot on the day she disappeared; he said that she did not.

1. Title 17–A M.R.S. § 201(*l*)(A) (2008) provides:

   1. A person is guilty of murder if the person:
   A. Intentionally or knowingly causes the death of another human being.

2. Title 17–A M.R.S. § 253(1)(A) (2008) provides in relevant part:

   1. A person is guilty of gross sexual assault if that person engages in a sexual act with another person and:

   A. The other person submits as a result of compulsion. . . .

3. Title 17–A M.R.S. § 651(1)(D) (2008) provides:

   1. A person is guilty of robbery if the person commits or attempts to commit theft and at the time of the person's actions:
   . . . .
   D. The actor intentionally inflicts or attempts to inflict bodily injury on another.

[¶ 4] Dwyer left work early on October 23 for what he listed as a doctor-related reason, departing at 2:42 p.m. The victim left work as scheduled at 3:24 p.m. At about 3:35 p.m., the victim entered Northeast Bank, where she had an account, purchased a $400 money order made out to her, and was given the original and a duplicate copy. After leaving the bank, the victim returned approximately two minutes later and cashed the money order, receiving four $100 bills. Shortly after 3:30 p.m., another co-worker saw the victim on foot on Lisbon Street, getting ready to cross the street. The victim did not report for her 4:00 p.m. shift at her second job that evening and was never seen alive again. When asked by police why he left work early on October 23, Dwyer stated that he wasn't feeling well and that he had driven for a while and then went to his home in Canton.

[¶ 5] Several weeks later, after an extensive search, the victim's body was discovered nearly fully buried in a secluded area. Her body was naked, with a cloth ligature tied around her left and right arms, and a cloth ligature with a brassiere wrapped around it on her neck. At an autopsy performed the next day, the Chief Medical Examiner observed that part of the victim's trachea was fractured, which is typical in strangulation cases. The Chief Medical Examiner determined that the cause of death was asphyxia due to ligature strangulation, with the date of death undetermined. She later testified that when someone is strangled, it takes thirty to forty seconds to lose consciousness, and between thirty seconds and four minutes to die.

[¶ 6] Using the barcode from a shovel found near the victim's body, police determined that an identical shovel and a flashlight had been purchased at an Auburn

store at 7:00 p.m. on the day the victim disappeared. It was the only such shovel sold at the store that day, and the only time between January 1 and November 12, 2007, that the combination of that particular shovel and flashlight had been sold at that Auburn store. A store videotape showed Richard Dwyer buying a shovel and a flashlight on October 23, 2007. He paid $100 cash for the $22 purchase, receiving $78 in change. Using the barcode from a pickax also found at the site, police were able to establish that an identical pickax had been sold at another Auburn store on October 23 at 8:20 p.m. A videotape from that store showed Dwyer purchasing the pickax.

[¶ 7] In the store videos, Dwyer can be seen wearing a red shirt; he was also seen wearing a red shirt in a work video recorded earlier that same day. In executing a search warrant at Dwyer's brother's house, where Dwyer was staying, police seized a similar-looking red shirt from Dwyer's bedroom. A forensic chemist with the State Crime Laboratory analyzed fibers taken from the shirt, and testified that they were similar to fibers taken from the ligatures on the victim's left and right wrists; the maternity pants found near the burial site; and the bar code sticker on the pickax handle.

[¶ 8] After analyzing a flashlight Dwyer left with his girlfriend, which was the same brand and size as the flashlight purchased on October 23, a forensic scientist from the Crime Lab testified that a fingerprint on the flashlight belonged to Dwyer. The Crime Lab's DNA analyst testified that DNA found on the flashlight matched the victim's DNA at nine of thirteen loci, and that the estimated probability of randomly selecting another match from the population was 1 in 32.9 billion.[4]

4. As the analyst noted, 32.9 billion people is a    number much greater than the total popula-

DNA consistent with Dwyer was also found on the flashlight. The analyst testified that 1 in 89 individuals would also have DNA consistent with the DNA found on the flashlight.

[¶ 9] On the shovel found near where the victim was buried, the analyst found DNA consistent with the victim; the probability of a random match was 1 in 4.71 million. DNA on a soda bottle also found at the scene matched the victim conclusively. The analyst also testified that DNA mixtures consistent with both the victim and Dwyer were found on: (1) a genital swab containing sperm taken from the victim; (2) the ligature taken from the victim's right wrist; (3) a string/piece of cloth found near where the victim was buried; and (4) an ID holder and lanyard found in the trunk of Dwyer's car.

[¶ 10] Dwyer's case proceeded to trial on September 12 and 15–18, 2008. The court denied his motion for a judgment of acquittal at the close of the State's case-in-chief. The jury returned verdicts of guilty after deliberating for less than two hours. At sentencing, the court entered judgment and sentenced Dwyer to life imprisonment on the murder count, and concurrent terms of thirty years on the gross sexual assault and robbery counts. This appeal followed. Dwyer was also granted leave to appeal his sentence by the Sentence Review Panel.

## II. DISCUSSION

### A. Dwyer's Motion to Compel Comparative DNA Analysis

[¶ 11] Dwyer contends that the court abused its discretion by denying his motion seeking an order to require the State to perform a comparative search of its convicted felon DNA database known as CODIS (Combined DNA Index System) to see if any of the database's approximately 9000 records matched each other at nine or more loci.[5] When a law enforcement agency attempts to connect a DNA sample to a particular person, it does not compare entire DNA sequences, but rather the DNA at thirteen specific places, or "loci." A person's DNA characteristics at those thirteen loci make up their DNA "profile." A "match" between an unknown sample and the profile of a particular person can occur at all thirteen or fewer loci. As more loci match, the probability increases that the DNA in the unknown sample comes from that person.

[¶ 12] The comparative search sought by Dwyer is known as an "Arizona search" because when it was first run by a DNA analyst in that state, it produced a nine-loci match between two unrelated individuals in the Arizona CODIS. A Maryland state court decision found that the random match probability for that occurrence was between 1 in 561 million and 1 in 754 million, yet the Arizona database contained only some 22,000 records. *See also United States v. Davis*, 602 F.Supp.2d 658, 681 (D.Md.2009) (describing matches of unrelated individuals found during Maryland CODIS search). A subsequent search in Arizona apparently yielded more matches, and in his motion Dwyer asserted similar results in Maryland and Illinois. Dwyer sought to obtain an "Arizona search" of Maine's CODIS database, to determine whether the results could be used to attack the probability statistics supporting the

tion of the world, which the analyst estimated to be six to eight billion people.

**5.** Dwyer's written motion requested matches at nine or more loci; his subsequent memo-

randum of law in support of the motion requested all matches, regardless of the number of loci.

DNA evidence he anticipated the State would introduce at trial.

[¶ 13] At the hearing on the motion, the State called one witness: Catharine MacMillan, a DNA analyst with the Maine State Police Crime Laboratory. Dwyer called none. No exhibits were offered. Consequently, the record before the Superior Court consisted of the testimony of the single witness, a *Los Angeles Times* article attached to Dwyer's motion, and a Maryland state trial court opinion attached to his memorandum in support of the motion.

[¶ 14] MacMillan testified at the hearing that she had never been asked to perform an "Arizona search," and that such a search on the CODIS in Maine would be problematic, stating, "We are aware that we have twins within that database, we have relatives within the database and we have duplicate samples within the database, so we would expect profiles to match based on those three reasons."[6] She pointed out that the database search in Arizona did not utilize the appropriate racial databases, nor would the proposed Maine search.

[¶ 15] The Superior Court denied Dwyer's motion, finding that:

> The State maintains, and the court agrees, that such a comparison is not reliable due to the known existence of twins, other relatives and duplicate samples already entered into the database.

The results of DNA comparison in this case are produced, as in other cases, by using FBI population studies, not only the limited information from the Maine database.

The court noted that it was not denying the motion based on any undue burden to the State, and pointed out that Dwyer might be able to use his argument to impeach the State's DNA evidence through cross-examination at trial, which in fact occurred.

[¶ 16] When deciding whether to order a forensic test involving expert evaluation, a court must consider whether the test might produce results or lead to evidence that will be admissible at trial. This requires the court to make a preliminary finding that the testimony will meet a threshold level of reliability. *State v. Bickart*, 2009 ME 7, ¶ 14, 963 A.2d 183, 187. The court must be "satisfied that the proffered evidence is sufficiently reliable to be held relevant."[7] *Id.* ¶ 15, 963 A.2d at 187 (quotation marks omitted). We review the Superior Court's ruling that the results of an "Arizona search" on the Maine CODIS would be unreliable, and thus not relevant, for an abuse of discretion.[8] *Id.* ¶ 15 n. 3, 963 A.2d at 188.

[¶ 17] In view of the limited evidence available to the court on the question of reliability, the court acted well within its discretion in denying Dwyer's

---

**6.** DNA profiles are not assumed to be unique among close relatives. *See United States v. Davis*, 602 F.Supp.2d 658, 673 (D.Md.2009).

**7.** Maine Rule of Evidence 402 provides that, "All relevant evidence is [generally] admissible.... Evidence which is not relevant is not admissible."

**8.** In *Bickart*, we noted that the trend had been to review a trial court's reliability determination for clear error. 2009 ME 7, ¶ 15 n. 3, 963 A.2d 183, 188; *see, e.g., Searles v. Fleet-*

*wood Homes of Pa., Inc.*, 2005 ME 94, ¶ 24, 878 A.2d 509, 516 ("We review a court's foundational finding that expert testimony is sufficiently reliable for clear error."); *State v. Poulin*, 1997 ME 160, ¶ 13, 697 A.2d 1276, 1279 ("A trial court's determination of the reliability of test results is a question of fact and is reviewed for clear error."). *Bickart* explained that in cases where the trial court's evaluation is less factual in nature, an abuse of discretion standard is appropriate. 2009 ME 7, ¶ 15 n. 3, 963 A.2d at 188.

motion. As was the case with the novel palm print analysis considered in *Bickart,* the results of an "Arizona search" have evidently never been recognized as a basis for an expert opinion in a published decision by any appellate court. *See id.* ¶ 12, 963 A.2d at 187. In deciding the admissibility of this novel scientific approach, the only evidence the court had before it was the testimony of the State's DNA expert witness stating that the results Dwyer sought would be unreliable. The expert witness gave logical reasons for her opinion that a comparative analysis would not produce scientifically reliable results, which the court accepted.

[¶ 18] In applying the abuse of discretion standard of appellate review in *Bickart,* we emphasized the significant role that the evidentiary record plays in defining the parameters of the court's discretion in determining admissibility:

> We need not and do not decide whether [the proffered] expert opinion testimony ... is generally admissible. Because our review in this case focuses on the trial court's discretionary call, our conclusion is much more narrow. On the record before him, the judge acted within his discretion in weighing the relevant factors and concluding that the threshold requirement of reliability had been met.

*Id.* ¶ 27, 963 A.2d at 191. As in *Bickart,* our review here focuses on the specific discretionary call made by the trial judge in this case. Without passing on the general admissibility of the results of a so-called "Arizona search" in all circumstances, we conclude based on the evidentiary record before him that the trial judge's decision was reasonable and well within the bounds of his discretion.

B. Change of Venue

[¶ 19] Dwyer contends that the court erred by denying his motion to change venue based on what he asserted was intensive, extensive, and prejudicial publicity. He pointed to various television reports, newspaper articles, and, to a great extent, comments left by readers on a newspaper's website in response to newspaper articles. The trial court acknowledged that the case had received publicity, but denied the motion based on its finding that it could not conclude that a fair jury could not be selected.

[¶ 20] We review a motion to change venue for an abuse of discretion. *State v. Holland,* 2009 ME 72, 146, 976 A.2d 227, 241. A change of venue is required if prejudice may be presumed, or if the defendant can show actual prejudice. *See State v. Dyer,* 2007 ME 118, ¶ 14, 930 A.2d 1040, 1043. Because Dwyer does not make a claim of actual prejudice here, the court was required to grant his motion and change venue only if extensive publicity "so taint[ed] the atmosphere surrounding the trial" that he could not "obtain a fair and impartial trial." *Id.*

[¶ 21] A review of the exhibits attached to Dwyer's motion confirms the accuracy of the trial court's observation that "[t]he printed news accounts ... are factual and not of a nature that is likely to raise the ire of jurors or create prejudice and animosity towards the defendant." The readers' comments, appended to news stories posted on the Internet, are certainly less factual. However, the comments represent the views of a select group that are addressed to a limited audience, and they do not necessarily represent the views held by the public at large. Dwyer does not assert that he lacked an adequate jury pool from which to draw an impartial jury, and the evidence would not support such a conclusion. Given this record, the court did not abuse its discretion.

## C. Photograph of the Crime Scene

[¶ 22] Prior to trial, Dwyer moved in limine to bar the State from seeking to admit certain photographs of the victim. One photograph, taken at the time her body was discovered, shows some of the excavation work at the burial site and three of her toes visibly protruding from the ground. It was admitted at trial over Dwyer's objection. Dwyer argues that the photo should have been excluded pursuant to M.R. Evid. 403, which states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."

[¶ 23] We review the admission of photographic evidence for an abuse of discretion. *Bickart*, 2009 ME 7, ¶ 36, 963 A.2d at 193. A photograph is admissible under Rule 403 "if it truly and accurately depicts what it purports to represent, is relevant to some issue involved in the litigation, and its probative value is not outweighed by any tendency it may have toward unfair prejudice." *Id.* (quotation marks omitted). "The guiding principle is that all relevant evidence should be admitted unless any prejudice overwhelms any potentially probative value." *Id.* ¶ 39, 963 A.2d at 193.

[¶ 24] The State explained in limine that it sought to admit the photo because it showed the effort Dwyer exerted in burying the victim, and thus was relevant to the intentional or knowing state of mind it was required to prove on the murder charge. The State chose not to seek admission of other, more potentially prejudicial photos that showed more of the victim's body.

[¶ 25] As we observed in *Bickart*, "[c]riminal juries are frequently required to consider photographic evidence that depicts gruesome, abhorrent or shocking images." 2009 ME 7, ¶ 40, 963 A.2d at 194. Even photographs meeting that description may be sufficiently relevant to outweigh any prejudice. Here, while the actual image of the photograph at issue and the mental image it suggests are disturbing, the photograph is not gruesome, abhorrent, or shocking. Because the photograph was relevant evidence, and its relevance was not outweighed by a tendency toward unfair prejudice, the trial court did not abuse its discretion in admitting the photograph.

## D. Prior Conviction Evidence

[¶ 26] Dwyer moved in limine to prevent the State from using his 1987 federal conviction for bank robbery to impeach him if he chose to testify. Dwyer agreed that use of the conviction was not time-barred by M.R. Evid. 609(b) because his incarceration did not end until 2006 due to parole violations, but he argued that because of the similarity between the conviction and the new robbery charge, its use would be unfairly prejudicial. The State sought to use the prior robbery conviction to impeach Dwyer through a showing of dishonesty.

[¶ 27] Maine Rule of Evidence 609(a) provides:

For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a specific crime is admissible but only if the crime (1) was punishable by death or imprisonment for one year or more under the law under which the witness was convicted, or (2) involved dishonesty or false statement, regardless of the punishment. In either case admissibility shall depend upon a determination by the court that the probative value of this evidence on witness credibility outweighs any unfair prejudice to a criminal defendant or to any civil party.

[¶ 28] The court initially deferred ruling on the motion, explaining that it was necessary to hear the evidence so it could assess the extent to which Dwyer's credibility would be at issue. After the State rested its case-in-chief, the court considered the evidence to that point, along with Dwyer's detailed offer of proof regarding his anticipated testimony. After noting that the admissibility of a prior conviction "depends upon the probative value of that conviction and whether that outweighs undue prejudice to the defendant," and emphasizing to the State that "the only thing that comes in is evidence of the conviction and none of the information behind it," the court concluded that the prior conviction was admissible because Dwyer's credibility would become a central issue on several important points.

[¶ 29] Because Dwyer did not testify, we review this issue only for an obvious error that "deprived [Dwyer] of a fair trial and resulted in a substantial injustice." *State v. Braley*, 2003 ME 125, ¶ 4, 834 A.2d 140, 141–42 (quotation marks omitted); *State v. Gray*, 2000 ME 145, ¶ 23, 755 A.2d 540, 545 (stating that when defendant does not testify, Law Court reviews decision to allow use of prior conviction for obvious error affecting substantial rights). Even when applying this standard of review, we have recognized that because of the "serious risk" that a prior conviction for a similar crime will be treated by the jury as propensity evidence, "[w]eighing the probative value of prior convictions against any unfair prejudice to the defendant is essential, especially when . . . some of the prior crimes are the same as the crimes charged." *Braley*, 2003 ME 125, ¶¶ 6, 8, 834 A.2d at 142–43.

[¶ 30] Unlike *Braley*, where we vacated a judgment because the trial court failed to articulate its Rule 609(a) reasoning on the record, here the Superior Court reserved judgment until it had heard the State's case-in-chief, applied the correct standard, and explained on the record the basis for its conclusion. The court also offered to give a limiting instruction to make sure that the jury used the fact of Dwyer's prior conviction only for its proper purpose. Although the court's explanation of its rationale for its decision to permit the admission of Dwyer's past conviction was stated in conclusory terms, we cannot conclude from the record before us that the decision rises to the level of obvious error.

E. Expert Testimony Concerning DNA Mixtures

[¶ 31] Dwyer moved in limine to bar the State from introducing evidence through its DNA expert concerning the significance of DNA mixtures taken from the victim's body and other physical evidence. Dwyer contended that the statistical probabilities involved were so low that the evidence was either irrelevant pursuant to M.R. Evid. 401, or inadmissible pursuant to Rule 403 because of the danger of "unfair prejudice, confusion of the issues, or misleading the jury." M.R. Evid. 403. The Superior Court ruled that, assuming a proper foundation, the evidence was relevant and Dwyer's argument went to weight, not admissibility. Dwyer did in fact cross-examine on this issue at trial. We review relevancy determinations for clear error, and decisions on admissibility for an abuse of discretion. *State v. Mills*, 2006 ME 134, ¶ 8, 910 A.2d 1053, 1056.

[¶ 32] Through its DNA expert, the State introduced evidence that: (1) the inclusion probability of Dwyer contributing sperm to the DNA mixture on a genital swab taken from the victim was 1 in 743, meaning that 1 in 743 Caucasians could have contributed to the mixture and Dwyer was consistent with the mixture

profile; (2) the inclusion probability of Dwyer contributing to a DNA mixture found on a flashlight he left with his girlfriend was 1 in 89;[9] (3) the inclusion probability for both Dwyer and the victim concerning a DNA mixture found on the ligature taken from the victim's right wrist was 1 in 20,300, meaning that both were consistent with the mixture, neither could be excluded from it, and 1 in 20,300 Caucasians was a potential contributor; (4) on a string/piece of cloth found near where the victim was buried, the inclusion probability for both the victim and Dwyer was 1 in 308; and (5) on the ID holder and lanyard found in the trunk of Dwyer's car, the inclusion probability for both Dwyer and the victim was 1 in 157.

[¶ 33] In *State v. Fleming*, we held that statistical data giving context to DNA evidence is relevant because in order for the jury to assign weight to DNA evidence, it must know how likely it is that the conclusion the proponent wants the jury to draw is correct. 1997 ME 158, ¶ 15, 698 A.2d 503, 507. Because the evidence was relevant to the question of whether each item connected Dwyer to the victim, the trial court did not abuse its discretion in ruling that the evidence was relevant and that the weight to be assigned to it was for the jury to determine. *See State v. Schmidt*, 2008 ME 151, ¶ 19, 957 A.2d 80, 86 ("Determinations of the weight and credibility to be afforded the evidence are within the fact-finder's exclusive province.").

## F. Life Imprisonment

[¶ 34] Dwyer contends that in imposing his sentence, the Superior Court erred in setting the basic sentence on the murder count at sixty-five to seventy-five years, and in setting the maximum and final sentence at life on the murder count, and at thirty years on the gross sexual assault and robbery counts.

[¶ 35] The permissible sentencing range for murder is twenty-five years to life. 17–A M.R.S. § 1251 (2008). Here, the State recommended a basic sentence of seventy years, while Dwyer requested a basic sentence of not more than thirty years. In the first step of the *Hewey* sentencing analysis, the court must "consider[ ] the particular nature and seriousness of the offense as committed by the offender." *State v. Downs*, 2009 ME 3, ¶ 17, 962 A.2d 950, 955 (quotation marks omitted); 17–A M.R.S. § 1252–C(1) (2008). Additionally, the court was required to "assign special weight" to the fact that the victim was pregnant when she was killed.[10] 17–A M.R.S. § 1251. The court's determination of the basic sentence is reviewed for misapplication of principle. *Downs*, 2009 ME 3, ¶ 17, 962 A.2d at 955.

[¶ 36] The trial court placed the offense in the highest category of seriousness based on its view of the evidence that Dwyer befriended a pregnant woman and met with her to discuss her buying a car,

9. The analyst also testified with regard to this sample that the random match probability as to the victim was 1 in 32.9 billion. The analyst explained that a random match probability estimates the likelihood that a DNA sample is attributable to a single source, and determines the likelihood that someone at random from the population would match the DNA profile at the same number of loci that the identified person had matched. The analyst also explained that 32.9 billion is much larger than the total population of the world, estimated to be six to eight billion people.

10. The statute also requires that Dwyer "knew or had reasonable cause to believe" that the victim was pregnant for the "special weight" provision to apply. 17–A M.R.S. § 1251 (2008). While the sentencing court did not explicitly make this finding, it is implicit given that the victim was in the late stages of her pregnancy.

then he bound her, robbed money from her, held her against her will, sexually assaulted her, and, ultimately, killed her. The court found that the victim did not die unexpectedly, quickly or painlessly. Given the statutory floor of twenty-five years for murder and the heinousness of the offense, the court's analysis does not demonstrate any misapplication of principle in arriving at the basic sentences.

[¶ 37] In the second step of the sentencing analysis, the court determines the maximum sentence and, in the case of murder, the final sentence by "considering all other relevant sentencing factors, both aggravating and mitigating." *Downs*, 2009 ME 3, ¶ 22, 962 A.2d at 956 (quotation marks omitted); 17-A M.R.S. § 1252-C(2) (2008). We review the second step decision for an abuse of discretion. *Downs*, 2009 ME 3, ¶ 22, 962 A.2d at 956. Additionally, because the court imposed a maximum and final sentence of life, we look to see if the sentence was justified by the presence of an aggravating factor.[11] *See State v. Shortsleeves*, 580 A.2d 145, 149 (Me.1990) (stating that "a life sentence is never justified unless the murder is accompanied by aggravating circumstances" (quotation marks omitted)).

[¶ 38] Here, the sentencing court justifiably found the presence of three *Shortsleeves* aggravating factors: sexual assault, premeditation, and torture. *Id.* at 149–50. Given this record, the jury could have found that Dwyer planned the crime in advance, as evidenced by the steps he took to set up a meeting with the victim on the pretext of selling her a car; that he sexually assaulted her; and that she was subjected to torture by being bound, raped, and then strangled, while almost certainly knowing in her final moments of life that she and her unborn child would die.

[¶ 39] The court also considered as an aggravating factor Dwyer's serious criminal record, which began at age nineteen and stretched for twenty-five years. That record included convictions for multiple burglaries, theft, escape, unlawful sexual contact (which the court found was an attempted rape), robbery, bank robbery (federal), assault, and OUI. Those convictions were accompanied by probation and parole violations. Given the length and seriousness of Dwyer's criminal record, the court found no mitigating factors, concluding: "I find that the defendant is beyond any hope for rehabilitation and that the only course available to the Court is that a life sentence be imposed."

[¶ 40] Dwyer asserted that his difficult childhood was a mitigating factor that should preclude the imposition of a life sentence in this case. The court acknowledged Dwyer's "unfortunate childhood" as part of its analysis, but noted that Dwyer had been given "plenty of opportunity . . . to change his ways." Given the heinousness of the crime for which Dwyer was sentenced, coupled with his serious, extensive criminal history, the court did not abuse its discretion in imposing a life sentence.

[¶ 41] The court did not separately indicate its reasoning in imposing the maximum possible sentences of thirty years concurrent on the robbery and gross sexual assault counts. However, having just analyzed those crimes as part of its *Hewey* process on the murder count, it is implicit that they were found to be at the most serious end of the spectrum for purposes of a basic sentence, and that there were serious aggravating factors offset by no mitigating factors for purposes of determining maximum and final sentences.

11. We recently explained that the *Shortsleeves* analysis is part of the first stage of the *Hewey* process. *State v. Hutchinson*, 2009 ME 44, ¶ 38, 969 A.2d 923, 934.

Furthermore, any error by the court in not specifically articulating its reasoning on the lesser crimes was harmless. There was a rational basis for the court to find that because the murder was so serious as to justify the imposition of a life sentence, the crimes that preceded and led up to the murder should be punished by no less than the maximum possible sentence.

[¶ 42] Finally, Dwyer argues that the Sixth Amendment, as construed by the U.S. Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and its progeny, requires that the presence of a *Shortsleeves* aggravating factor be found by a jury beyond a reasonable doubt. Recently, and subsequent to the submission of the briefs in this appeal, we rejected that argument in *State v. Hutchinson*, 2009 ME 44, ¶¶ 34, 38, 969 A.2d 923, 933, 934 (stating that *Shortsleeves* factors provide guidance to sentencing courts, which does not offend the Sixth Amendment).

[¶ 43] We find Dwyer's remaining contentions, including his challenge to the sufficiency of the evidence, to be without merit and do not address them separately.

The entry is:

Judgment and sentences affirmed.